UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

DEVIN K. SCHAFFER,

                Plaintiff,

        - against -

GENEDX, LLC and GENEDX HOLDINGS,
CORP.,

                Defendants.

-------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:
:

25 Civ. 2550 (DEH) (GS)

REPORT & RECOMMENDATION

**GARY STEIN, United States Magistrate Judge:**

Plaintiff Devin Schaffer ("Plaintiff" or "Schaffer") brings this action against his former employer, asserting claims for race and sex-based discrimination in violation of federal, state, and local laws as well as common law claims for fraudulent misrepresentation and inducement, breach of contract, breach of the covenant of good faith and fair dealing, and intentional infliction of emotional distress.  (Dkt. No. 28).  Defendants GeneDx, LLC and GeneDx Holdings, Corp. ("GeneDx" or "Defendants") move to dismiss the action in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Dkt. No. 29).  For the reasons set forth below, this Court respectfully recommends that Defendants' motion be **GRANTED** as to all of Plaintiff's common law claims and **GRANTED IN PART AND DENIED IN PART** as to Plaintiff's statutory discrimination claims.[1]

---

[1] On May 7, 2025, the Honorable Dale E. Ho referred this matter to the undersigned for general pretrial supervision and dispositive motions requiring a report find recommendation.  (Dkt. No. 19).

**BACKGROUND**

### A. Plaintiff's Allegations

The following facts are taken from Plaintiff's operative complaint, the Amended Complaint filed on June 25, 2025 (Dkt. No. 28 ("Compl.")), and are assumed to be true for purposes of this motion. *See R.M. Bacon LLC v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 509, 512 (2d Cir. 2020).

### 1. Plaintiff's Hiring

Schaffer, a Black man, served as GeneDx's General Counsel from March 2023 to August 2024, when he was terminated. (Compl. ¶¶ 24, 27–28). GeneDx Holdings, Corp. is a publicly traded company and GeneDx, LLC is its wholly-owned subsidiary. (*Id.* ¶ 4). Defendants have offices in Stamford, Connecticut and New York City. (*Id.* ¶ 25).

Prior to his hiring by Defendants, Schaffer worked in several legal roles, including as Vice President and Associate General Counsel of Cardinal Health, a large healthcare services and products company. (*Id.* ¶ 17). While at Cardinal Health, Schaffer learned of a potential opportunity with GeneDx from Ann Hiat, a recruiter. (*Id.* ¶ 18). Hiat informed Plaintiff that "Defendants were seeking someone with his level of public company experience in the healthcare space to 'lead the team responsible for all legal and regulatory matters.'" (*Id.* ¶ 19).

In March 2023, Schaffer interviewed with Katherine Stueland, GeneDx's CEO, and Jason Ryan, Executive Chairman of GeneDx's Board of Directors. (*Id.* ¶¶ 21, 35). Stueland and Ryan confirmed to Schaffer that GeneDx was looking for a

General Counsel who would be responsible for "implementing enhanced corporate governance" and also "responsible for all legal and regulatory matters for the Company."  (*Id.* ¶¶ 22–23; *see also id.* ¶ 35 (alleging that Plaintiff's conversation with Stueland was "consistent with what Plaintiff discussed with Ms. Hiat" with respect to what Plaintiff's job responsibilities would be, but that his conversation with Ryan was "geared more toward personality fit" than substantive matters)).

On March 27, 2023, Schaffer signed an Employment Agreement ("Agreement" or "Agmt.") to become GeneDx's General Counsel.  (*Id.* ¶¶ 24, 38).[2] The Agreement provided for Schaffer to perform his services remotely from his home in Ohio, subject to regular travel to GeneDx's offices in Connecticut or other locations.  (Agmt. § 1(C); see Compl. ¶¶ 3, 15).  The Agreement was for a three-year term, but could be terminated by GeneDx either with or without cause; if GeneDx terminated without cause, Plaintiff would be eligible for a substantial severance. (Compl. ¶¶ 94, 125–26; Agmt. §§ 2, 5(B), 5(D)).

The Agreement provided that Schaffer "shall perform the duties commensurate with those of a General Counsel, including without limitation those

---

[2] The Employment Agreement is attached as an exhibit to the Declaration of Scott R. Wilson, submitted in support of Defendants' motion to dismiss.  (Dkt. No. 31 Ex. 1).  As the Employment Agreement is incorporated by reference into Plaintiff's operative complaint (indeed, it forms the basis for Plaintiff's breach of contract claim) (*see, e.g.*, Compl. ¶¶ 24, 38–40, 115–23), the Court will consider it in ruling on Defendants' motion to dismiss.  *See, e.g.*, *Powe v. Cambium Learning Co.*, No. 08 Civ. 1963 (JGK), 2009 WL 2001440, at *2 (S.D.N.Y. July 9, 2009) (finding that employment agreements were "incorporated by reference into the Amended Complaint and may therefore be considered by the Court on this motion to dismiss"); *see also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (noting that "'[courts] must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss,'" such as "'documents incorporated into the complaint by reference'" (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007))).

listed" in a document attached as Exhibit A to the Agreement.  (Compl. ¶ 40; Agmt. § 1(A)).  The duties listed in Exhibit A were: "1) Advise on growth strategy, potential risks, and creative solutions from all perspectives; 2) Assist in setting and implementing the Corporation's overall direction and policies; 3) Advise on general and commercial legal matters including, but not limited to, employment law, contracts/negotiations, intellectual property, litigation, mergers and acquisitions, government relations, and other general business legal issues; 4) Serve as a trusted advisor to the Corporation's Chief Executive Officer and other senior leaders of the Corporation on a wide range of strategic, tactical, and operational issues; and 5) Manage legal risks as well as overseeing compliance."  (Compl. ¶ 40; Agmt. Ex. A).

## 2. Plaintiff's Tenure as General Counsel

Schaffer began work as General Counsel on March 27, 2023.  (Compl. ¶ 33). He was part of GeneDx's Executive Leadership Team and reported directly to Stueland.  (*Id.* ¶ 47).  Upon assuming his position, Schaffer was told by Stueland, consistent with his prior understanding, that "he would be in charge of all 'legal and regulatory' affairs.'"  (*Id.* ¶ 46).  GeneDx's public announcement of Schaffer's hiring, issued a few days later on April 3, 2023, similarly stated he would "be responsible for all legal, compliance, and regulatory activities for GeneDx."  (*Id.* ¶ 47).

However, Schaffer soon discovered that his job responsibilities were not what he expected they would be.  He "was not allowed to make fundamental decisions related to legal concerns," such as which outside counsel GeneDx worked with.  (*Id.* ¶ 48).  He learned that the only outside counsel he could use was Fenwick & West

4

LLP ("Fenwick"), due to a personal friendship between Fenwick partner Ethan Skerry and a GeneDx board member, something which was not disclosed to him prior to hiring. (*Id.* ¶¶ 48–49). In addition, in April 2023, Schaffer was told by Stueland that "lab director and regulatory and governmental affairs"—also described in the Amended Complaint as "the FDA/Governmental Affairs function—would continue to report to the Chief Commercial Officer, not to him. (*Id.* ¶ 51).

Stueland insisted on inviting Skerry, the Fenwick partner, to sit in on her monthly meetings with Schaffer and his Deputy General Counsel to discuss legal matters. (*Id.* ¶ 53). Schaffer "did not care for [this] arrangement," which he felt was done "to watch what he was doing" and "affected [his] ability to lead the legal and compliance function (especially in the eyes of the Board)." (*Id.*). The same dynamic played out at GeneDx Board of Director meetings, which were all attended by Skerry or another Fenwick lawyer. (*Id.*). Stueland would call Skerry for advice on strategic matters rather than consulting Schaffer. (*Id.* ¶ 54). Further, when Plaintiff, shortly after joining GeneDx, suggested bringing other law firms on board to control the company's legal spending, Stueland told him GeneDx would not be switching firms due to Fenwick's "relationship with the Board." (*Id.* ¶ 50).

These events, Plaintiff alleges, show that "it was clear that Defendants intentionally lied to Plaintiff regarding the General Counsel role." (*Id.*). According to Plaintiff, since the Chief Commercial Officer retained responsibility for FDA/Governmental Affairs matters, "it is clear that at no time did Defendants allow Plaintiff to oversee regulatory matters, despite their recruitment promises to him to

the contrary." (*Id.* ¶ 106).  Similarly, Plaintiff alleges he "was also lied to inasmuch as he was promised that he would be responsible for overseeing legal matters, including the selection and use of outside counsel." (*Id.* ¶ 107).

In addition, Plaintiff alleges that he was the victim of race-based and sex-based discrimination.  He claims that Stueland, herself a White female, "favored White females" and hired White females into positions with no relevant experience. (*Id.* ¶¶ 21, 77, 134.a).  During Schaffer's employment, Stueland would frequently brag about Defendants' high rate of female employees, approximately 70%.  (*Id.* ¶ 30).  She complained about male CEOs being able to take credit for achievements that she, as a woman CEO in a male-dominated space, was unable to do.  (*Id.* ¶¶ 30, 77).

When Schaffer was hired, he requested, but was denied, a $100,000 sign-on bonus, yet GeneDx later awarded a $250,000 sign-on bonus to the new Chief Commercial Officer, Melanie Duquette, a White female, who was also a member of the Executive Leadership Team.  (*Id.* ¶ 31).  In December 2023, Stueland and the chair of the Compensation Committee approved giving each member of the Executive Leadership Team an equity grant of either 65,000 or 75,000 shares of GeneDx stock.  (*Id.* ¶ 68).  Yet at a meeting of the Compensation Committee in February 2024, Schaffer's share was reduced to 35,000 shares, with the difference going to Duquette.  (*Id.* ¶ 72).

At the same time, Stueland and others at GeneDx would seek the advice of Skerry and other White partners at Fenwick, cutting Plaintiff out, while having

6

Plaintiff's work "unfairly monitored" by White partners at Fenwick, "belittl[ing]" Plaintiff. (*Id.* ¶¶ 53–54, 73, 134.b, c, e, f, h). Further, Schaffer "would be blamed for issues that White counterparts were responsible for and/or faced no consequences." (*Id.* ¶ 134.l). For example, Stueland blamed Schaffer for failing to follow up on a Compensation Committee issue, referring to it as a "miss" by Plaintiff, when it was a White partner at Fenwick who was supposed to have followed up on the issue. (*Id.* ¶ 71; *see also id.* ¶¶ 69, 82–84).

As described in the Amended Complaint, Schaffer's relationship with Stueland was rocky. She made "odd" and "confusing" comments during an early weekly "one-on-one call" with Schaffer, and frequently canceled the weekly calls altogether. (*Id.* ¶¶ 44, 51). Stueland unfairly criticized Schaffer for things that were not his fault, admonishing him in "terse" and "harsh" terms and creating a working environment that was "extremely toxic, hostile and discriminatory." (*Id.* ¶¶ 64, 67, 69, 73, 92, 95).

Approximately a year into Plaintiff's tenure, Stueland directed him to work with an executive coach, even though, according to Plaintiff, he did not need an executive coach as he was properly performing his job responsibilities. (*Id.* ¶ 78). The executive coach, who had worked with Stueland at Stueland's prior employer, shared with Schaffer that Stueland felt controlled by certain GeneDx Board members and, as a result, took out her frustrations by "act[ing] out negatively toward teammates in a hostile manner, including Plaintiff." (*Id.* ¶ 79).

### 3. Plaintiff's Termination

On August 2, 2024, Schaffer was told by Stueland and GeneDx's head of Human Resources that he was going to be terminated. (*Id.* ¶ 93). Stueland explained that Plaintiff's termination was due to him not being in "lock-step" with her, and also due to performance "misses" by Plaintiff. (*Id.*). When Schaffer, who had received positive written feedback from Stueland at the end of 2023 (*id.* ¶ 70), asked what the "misses" were, Stueland referred to an insider trading issue related to a potential trade by a Board member. (*Id.* ¶ 93). Schaffer "ha[d] no idea what [Stueland] was referring to." (*Id.*).

On August 8, 2024, Schaffer received a letter from GeneDx's head of HR announcing his termination as General Counsel without cause. (*Id.* ¶ 94). Pursuant to the Agreement, Schaffer was terminated on 60 days' notice and paid salary through the end of that period, but his last date of active employment was August 8, 2024. (*Id.*). On November 18, 2024, GeneDx announced that it was replacing Plaintiff by hiring Heidi Chen, a female, as Chief Legal Officer. (*Id.* ¶ 98).

On October 8, 2024, Schaffer filed discrimination charges with the Equal Employment Opportunity Commission and relevant Connecticut, New York State, and New York City administrative agencies. (*Id.* ¶ 8). After exhausting his administrative remedies, he filed this action. (*Id.* ¶ 10).

The Amended Complaint asserts thirteen causes of action against Defendants for (1) fraudulent misrepresentation and inducement; (2) breach of express contract; (3) breach of the implied covenant of good faith and fair dealing; (4) discrimination

based on race in violation of Title VII, 42 U.S.C. § 2000e ("Title VII"); (5) discrimination based on race in violation of 42 U.S.C. § 1981 ("§ 1981"); (6) discrimination based on race in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL"); (7) discrimination based on race in violation of the New York City Human Rights Law § 8-107 ("NYCHRL"); (8) discrimination based on race in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §46a-60(a) ("CFEPA"); (9) discrimination based on sex in violation of Title VII; (10) discrimination based on sex in violation of the NYSHRL; (11) discrimination based on sex in violation of the NYCHRL; (12) discrimination based on sex in violation of the CFEPA; and (13) intentional infliction of emotional distress.  (Compl. ¶¶ 2, 101–207).

### B. Procedural History

Plaintiff originally commenced this action on March 27, 2025.  (Dkt. No. 1). On April 21, 2025, Defendants filed a motion to dismiss.  (Dkt. Nos. 12–13).  On May 5, 2025, Plaintiff filed a letter motion seeking a one-month extension of time to respond to the motion to dismiss.  (Dkt. No. 17).  Over Defendants' objection (Dkt. No. 18), the Court granted Plaintiff's request in part, setting a deadline of May 21, 2025 for Plaintiff to file his opposition.  (Dkt. No. 20).

Rather than file an opposition, Plaintiff filed an amended complaint on May 21, 2025.  (Dkt. No. 21).  Later that day, Defendants moved to strike Plaintiff's amended complaint.  (Dkt. No. 22).  Defendants argued that because the deadline for Plaintiff to file an amended complaint as of right had passed, Plaintiff was

required to seek Defendants' consent or leave of the Court.  (*Id.*).  Construing

Plaintiff's request for an extension of time as a request, in the alternative, to file an

amended complaint, the Court directed Plaintiff to file a revised proposed amended

complaint, along with a redline comparison to the original Complaint, in accordance

with Local Rule 15.1, by May 28, 2025.  (Dkt. No. 24).  Plaintiff moved to amend his

Complaint on May 27, 2025.  (Dkt. No. 25).

Plaintiff's proposed amended complaint added a claim for breach of the

implied covenant of good faith and fair dealing and provided additional factual

allegations.  (*See* Dkt. No. 25 Ex. 2).  Defendants did not oppose Plaintiff's motion to

amend, which the Court granted on June 13, 2025.  (Dkt. No. 26).  Plaintiff filed his

Amended Complaint on June 25, 2025.  (Dkt. No. 28).[3]

On July 3, 2025, Defendants moved to dismiss Plaintiff's operative complaint.

(Dkt. No. 29).  Defendants accompanied their motion with a memorandum of law

(Dkt. No. 30 ("Def. Br.")) and a Declaration from their counsel attaching a copy of

the Employment Agreement (Dkt. No. 31).  On August 7, 2025, Plaintiff filed his

opposition brief (Dkt. No. 34 ("Pl. Br.")), and Defendants filed their reply brief on

August 25, 2025 (Dkt. No. 35 ("Def. Reply")).

## LEGAL STANDARDS

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to

state a claim upon which relief can be granted."  "To survive a motion to dismiss, a

---

[3] Plaintiff first attempted to file this complaint on June 23, 2025 (Dkt. No. 27), which was rejected by the Clerk's Office as improperly signed.  Accordingly, Plaintiff filed the operative complaint, which is identical but for amending the filing deficiencies.

complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* The factual allegations "must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 (complaint must raise "more than a sheer possibility that a defendant has acted unlawfully").

In considering a motion to dismiss under Rule 12(b)(6), the Court must "accept[] all factual allegations in the complaint as true" and "draw[] all reasonable inferences in the plaintiff's favor."  *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (citation omitted).  Courts need not, however, consider "conclusory allegations or legal conclusions couched as factual allegations."  *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (citation omitted); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Determining whether a plausible claim has been pled is "a context-specific task" that requires the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 113 (2d Cir. 2023).  However, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations."  *Twombly*, 550 U.S. at 556

11

(citation omitted).  "[T]he court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side[.]" *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).

## DISCUSSION

Defendants' motion to dismiss is directed at all thirteen of Plaintiff's causes of action.  The Court will discuss the legal sufficiency of the various causes of action in the order in which they are presented in Plaintiff's Amended Complaint and Defendants' motion, beginning with Plaintiff's claims arising from his hiring and Employment Agreement (*i.e.*, his fraud-based and contract-based claims), continuing with his statutory discrimination claims, and ending with his claim for intentional infliction of emotional distress.

### A.  Fraudulent Inducement Claim

Schaffer claims that he was fraudulently induced to come to GeneDx based on misrepresentations concerning the terms and conditions of his role as General Counsel.  (Compl. ¶¶ 103–04).  The gravamen of Schaffer's fraud claim is that he was told by CEO Stueland and Board Chair Ryan during the recruitment process that "he would be in charge of all 'legal and regulatory' affairs" at GeneDx and that this proved not to be the case.  (*Id.* ¶¶ 23, 35, 46, 104.a, 105–06).  Schaffer alleges that he relied on these representations and, had he known they were false, he never would have left his prior employer, Cardinal Health, and taken the position with GeneDx.  (*Id.* ¶¶ 109, 111).  He alleges damages based on the lost wages, benefits,

and incentives he would have received at Cardinal Health had he stayed there.  (*Id.* ¶ 112).

To plead a claim for fraudulent inducement under New York law,[4] a plaintiff must allege the following elements: (1) a material misrepresentation or omission of fact, (2) defendant's knowledge of falsity, (3) defendant's intention to induce reliance, (4) reasonable reliance by the plaintiff, and (5) resulting injury or damages.  *AT&T Corp. v. Atos IT Sols. & Servs., Inc.*, 714 F. Supp. 3d 310, 329 (S.D.N.Y. 2024).  In addition, under Fed. R. Civ. P. 9(b), plaintiffs alleging fraud "are subject to a heightened pleading standard," *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir. 2013), and "must state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b).

GeneDx advances four arguments for dismissal of Schaffer's fraud claim: (1) that it fails to plead fraud with the particularity required by Rule 9(b); (2) that it fails to allege a misrepresentation of existing fact; (3) that it is barred by a merger provision in the Employment Agreement; and (4) that it fails to allege actual pecuniary loss.  (Def. Br. at 8–13).  The Court considers each of these arguments in turn.

---

[4] Both Schaffer and GeneDx rely on New York law for their arguments concerning Schaffer's fraud claim.  (*See* Def. Br. at 8–13; Pl. Br. at 2–6).  Given this, and in the absence of any indication of a substantive difference between New York law and that of any other potentially applicable jurisdiction, the Court need not conduct a choice of law analysis and will instead apply New York law to Schaffer's fraud claim.  *See, e.g., Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.,* 447 F. Supp. 2d 329, 336–37 (S.D.N.Y. 2006) ("[A choice of law] analysis is unnecessary because the parties' briefs assume that New York law controls and 'such implied consent . . . is sufficient to establish choice of law.'" (quoting *Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir. 2000))).

### 1. Adequacy of Fraud Allegations Under Rule 9(b)

To satisfy Rule 9(b), allegations of fraud must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Nakahata*, 723 F.3d at 197 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  "In addition, the plaintiff must 'allege facts that give rise to a *strong* inference of fraudulent intent.'" *Id.* at 198 (quoting *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 179 (2d Cir. 2004) (emphasis in original)).  "'The requisite "strong inference" of fraud may be established either (a) by alleging facts to show that [the] defendant[] had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Rodgers-King v. Candy Digital Inc.*, No. 23 Civ. 2591 (RA), 2024 WL 382092, at *6 (S.D.N.Y. Feb. 1, 2024) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006)).

GeneDx first argues that the Amended Complaint does not plead facts suggesting that the alleged misrepresentations were false.  (Def. Br. at 9).  According to GeneDx, the Amended Complaint merely alleges that Stueland and Ryan said they *wanted* a General Counsel who could be responsible for all legal and regulatory matters, but such a statement does not rise to the level of an affirmative representation that Schaffer would, in fact, be given those duties.  (*Id.* (citing Compl. ¶¶ 22–23)).  This argument is unpersuasive, however, as it fails to take into

14

account the full breadth of Schaffer's allegations or view them in the light most favorable to Plaintiff, as required on a motion to dismiss.

According to the Amended Complaint, before Schaffer was hired, Hiat, the recruiter, told him that Defendants were "seeking someone with his level of public company experience in the healthcare space to 'lead the team responsible for all legal and regulatory matters.'" (Compl. ¶ 19). Schaffer then alleges that, in his pre-hiring conversations with Stueland and Ryan, they "confirmed" what Hiat had said (*id.* ¶ 23) and that his conversation with Stueland, in particular, "was consistent with what Plaintiff discussed" with Hiat with respect to his "being responsible for all legal and regulatory matters for the Company." (*Id.* ¶ 35). Then, once Schaffer assumed the General Counsel position, Stueland told him that "he would be in charge of all 'legal and regulatory' affairs" (*id.* ¶ 46), and within a week GeneDx issued a press release stating that Schaffer "will be responsible for all legal, compliance, and regulatory activities for GeneDx" (*id.* ¶ 47).

Read in the light most favorable to Plaintiff, these allegations are sufficient to plead that in the pre-hiring discussions, Schaffer was led to believe not merely that GeneDx *wanted* a General Counsel who would be responsible for all legal and regulatory matters, but that Schaffer was being hired to perform that role. When an employer tells a prospective employee the duties it is looking for or "want[s]" the person to perform, it is normally reasonable for the applicant to understand that he or she will be given those duties (absent some caveat by the employer to the effect that the employee will not be given those duties right away). That GeneDx made

15

statements within close proximity of Schaffer's hiring explicitly confirming that he *would*, in fact, be responsible for all legal and regulatory activities lends further plausibility to Schaffer's characterization of what he was told. It would not have made much sense for GeneDx to have expanded Schaffer's job responsibilities, via a public announcement issued virtually immediately after he was hired, in a manner inconsistent with the pre-hiring discussions.

GeneDx also argues, however, that even if Schaffer was told that he would be responsible for all legal and regulatory matters, the Amended Complaint does not plead facts suggesting that Stueland and Ryan knowingly misled Schaffer or intended to defraud him. (Def. Br. at 9; Def. Reply at 3). With this argument GeneDx stands on firmer ground.

Schaffer provides two primary bases for his claim that Defendants never intended to turn over to him "all legal and regulatory matters." First, Schaffer alleges that he was informed after his hiring that "FDA/Governmental Affairs" duties would be overseen by the company's Chief Commercial Officer, who had already been handling those duties prior to his arrival. (*Id.* ¶¶ 52, 106). Second, Schaffer alleges that Ryan and another board member demanded that Fenwick remain "the only outside counsel that Defendants could use." (*Id.* ¶¶ 48, 107; *see also id.* ¶ 50). Thus, Schaffer did not have full control over all legal and regulatory duties. (*See* Pl. Br. at 3–5).[5]

---

[5] In his opposition brief, Schaffer claims that he also learned after joining GeneDx that the Chief Commercial Officer oversaw "corporate governance," which was contrary to what he had been told before he was hired. (Pl. Br. at 4). The Amended Complaint, however, is devoid of allegations to this effect, and in fact affirmatively alleges that "[a]s soon as Plaintiff started, *he had his hands full*

16

Notably, however, Schaffer does *not* allege—at least not with the particularity required by Rule 9(b)—that Stueland, Ryan, or anyone else at GeneDx specifically told him during the recruitment process either that his responsibilities would include the FDA/Governmental Affairs function or that he would have the ability to retain outside counsel of his choosing.[6]  Schaffer does not even allege that these subjects came up during his pre-hiring discussions with Stueland and Ryan, or that he inquired, or expressed any interest, as to whether his duties would embrace the FDA/Governmental Affairs function or the authority to select outside counsel of his choosing.  Likewise, the list of duties to be performed by Schaffer as General Counsel, attached as Exhibit A to his Employment Agreement, does not say that Schaffer would be responsible for FDA/Governmental Affairs matters or for retaining outside counsel.  Rather, it states generally (in relevant part) that Schaffer would "[a]dvise on general and commercial legal matters," including, *inter alia*, "government relations," and would also "[m]anage legal risks" and "oversee[] compliance."  (Agmt. § 1(A) & Ex. A).

---

getting the corporate governance infrastructure in order."  (Compl. ¶ 45; emphasis added).  Similarly, Schaffer's brief claims that he learned that the Chief Commercial Officer was responsible for "*all* regulatory matters."  (Pl. Br. at 5; emphasis added).  But the allegations in the Amended Complaint likewise do not support, and in fact contradict, this assertion.  (*See* Compl. ¶ 52 (alleging a more limited role by the Chief Commercial Officer in regulatory matters)).

[6] In his cause of action for breach of contract, Schaffer alleges that he was told he would be responsible for all legal and regulatory matters "including" the selection of outside counsel, and that he "would be told that he would have FDA/Governmental Affairs responsibilities."  (Compl. ¶¶ 104.b, 107).  In the context of Plaintiff's allegations as a whole, it seems evident that these allegations involve extrapolation from Defendants' statements to the effect that Plaintiff would be responsible for all legal and regulatory activities, rather than an allegation that Defendants specifically represented that Plaintiff would be responsible for selecting outside counsel or for FDA/Governmental Affairs activities.  At a minimum, if Schaffer did intend to allege such specific misrepresentations, he did not plead them with the particularity required by Rule 9(b), *e.g.*, he does not allege who made such representations or where or when they were made.

Nor does Schaffer allege any other facts suggesting that Stueland or Ryan had in mind, during their pre-hiring discussions with Schaffer, the Chief Commercial Officer's role with respect to FDA/Governmental Affairs matters or Fenwick's role as the company's preferred outside counsel—let alone that they tried to conceal those facts from Schaffer. There is nothing in the Amended Complaint to indicate that, at the time of their pre-hiring discussions with him, Stueland or Ryan anticipated or reasonably could have anticipated that Schaffer, after he joined GeneDx, would have sought to displace Fenwick or wanted the FDA/Governmental Affairs function to fall within his remit. Significantly, Schaffer does not allege that when, after becoming General Counsel, he learned about Fenwick's role and the Chief Commercial Officer's responsibility for FDA/Governmental Affairs, he registered any protest or objection. (*See* Compl. ¶¶ 50, 52). So far as can be discerned from his allegations, Schaffer himself never claimed any inconsistency between those facts and what he had been told or understood during the pre-hiring process until he filed this action.

Against this backdrop, the facts as alleged in the Amended Complaint, taken as true, do not plausibly or sufficiently allege the requisite strong inference of scienter—*i.e.*, that Defendants knowingly or intentionally deceived Schaffer about what his job responsibilities would be in order to induce him to leave his prior employer and join GeneDx. *See, e.g., Rodgers-King*, 2024 WL 382092, at *7 (dismissing fraudulent inducement claim against former employer, despite plaintiff's allegations that he was told during the application process that "he would

18

have the entire product management department reporting to him" and that "these promises were 'lies,'" since "[t]his conclusory assertion . . . lacks any factual basis for the assertion that [the employer's representatives] had fraudulent intent at the time they made the alleged promises"); *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, No. 03 Civ. 1537 (MBM), 2003 WL 23018888, at *13 (S.D.N.Y. Dec. 22, 2003) ("[Plaintiff] has failed to plead a cause of action for fraudulent inducement because it has not alleged that [defendant] knew the statements to be false at the time the statements were made or that [defendant] intended to defraud [plaintiff].").

Schaffer's scienter allegations fail whether analyzed under a "motive and opportunity" theory or a "conscious misbehavior or recklessness" theory. As to motive, the Amended Complaint alleges only that Defendants made "deliberately false statements" to Plaintiff to induce him to join and remain with GeneDx "long enough to use his legal experience and knowledge coming from Cardinal Health." (Compl. ¶ 103). But "a generalized motive that does not result in concrete benefits to the defendant is insufficient to plead scienter," *Stamelman* v. *Fleishman-Hillard, Inc.*, No. 02 Civ. 8318 (SAS), 2003 WL 21782645, at *6 (S.D.N.Y. July 31, 2003), and Schaffer does not identify any concrete benefits that Defendants sought or obtained from his experience at Cardinal Health. Hence, Schaffer "fails to plausibly allege facts that show motive." *Rodgers-King*, 2024 WL 382092, at *7 (finding insufficient allegations that defendant-employer "'made deliberately false statements' in order to induce [plaintiff] to join [defendant] 'long enough to use his industry knowledge,'"

19

as "[t]his conclusory allegation fails to detail the concrete benefits that [defendant] would realize from its alleged fraud").

Likewise, Schaffer does not plead "strong circumstantial evidence of conscious misbehavior or recklessness." *Shields*, 25 F.3d at 1128. Where, as here, "'the alleged misrepresentation concerns future conduct, the defrauded party must allege specific facts showing that the promisor intended not to honor her obligations at the time she made the statement,' and '[t]he defrauded party may not satisfy this requirement simply by showing that the future event never occurred.'" *Rodgers-King*, 2024 WL 382092, at *6 (quoting *Stamelman*, 2003 WL 21782645, at *7). Schaffer's allegations "suggest[] only that the future promise never occurred, and not that [GeneDx] had fraudulent intent at the time it made the alleged misrepresentation." *Id.*

To be sure, Schaffer alleges, in conclusory fashion, that Defendants' promises about his responsibilities "were untrue and known to be untrue at the time they were made." (Compl. ¶ 106; *see also, e.g.*, ¶¶ 50, 103 (alleging "Defendants made deliberately false statements"), 107 (alleging Defendants "lied")). But such "[c]onclusory allegations of fraudulent intent, without more, are insufficient to sustain a fraud claim." *Hoffman v. Kashi Sales, L.L.C.*, 646 F. Supp. 3d 550, 563 (S.D.N.Y. 2022). Although knowledge may be averred generally, a plaintiff must "allege circumstances that give rise to a strong inference that the defendants knew the statements to be false," even where the plaintiff "has adequately identified the statements alleged to be misrepresentations and properly indicated when, where

20

and by whom they were made." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 173 (2d Cir. 1990). Schaffer's allegations fall short of clearing this bar.

### 2. Misrepresentation of Existing Fact

Defendants' second argument[7] is that Plaintiff fails to allege "any misrepresentation of 'present fact,' as required under New York law," and instead merely alleges that Defendants did not intend to perform their contractual duties, which is non-actionable. (Def. Reply at 3–4; *see* Def. Br. at 10). Defendants are incorrect.

There is a "fine line" under New York law between "actionable misrepresentations of present facts," on the one hand, and "non-actionable promises reflecting an intent to perform in the future," on the other. *Power Up Lending Grp., Ltd. v. Murphy*, No. 16 Civ. 1454 (ADS) (AYS), 2017 WL 1497974, at *3 (E.D.N.Y. Apr. 26, 2017). As a general matter, "'while mere promissory statements as to what will be done in the future are not actionable, . . . it is settled that, *if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of material existing fact* upon which an action for rescission [based on fraudulent inducement] may be predicated.'" *Id.* at *4 (quoting *Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) (emphasis in original)). Thus, "[i]n order to assert a claim of fraudulent inducement with respect to a promise of some future actions or performance, the complaint must allege that the

---

[7] Although the pleading deficiencies described in Discussion § A.1 require dismissal of Plaintiff's fraudulent inducement claim, the Court addresses Defendants' other arguments for dismissal of this claim for the sake of completeness.

speaker did not intend to fulfill the promise at the time it was made." *Leighton v. Poltorak*, No. 17 Civ. 3120 (LAK) (KNF), 2018 WL 2338789, at *5 (S.D.N.Y. May 23, 2018) (cleaned up).

A more refined analysis applies when the allegedly fraudulent promises are made in a contract between the parties. In New York, "a fraud claim cannot derive wholly from a counter-party's false statement of an intent to perform under a contract. Rather, to say that a contracting party intends when he enters into an agreement not to be bound by it is not to state 'fraud' in an actionable area, but to state a willingness to risk paying damages for breach of contract." *Ronis v. Carmine's Broadway Feast, Inc.*, No. 10 Civ. 3355 (TPG), 2012 WL 3929818, at *7 (S.D.N.Y. Sept. 7, 2012) (cleaned up). Thus, under New York law, "[a] claim for fraudulent inducement of contract can be predicated upon an insincere promise of future performance only where the alleged false promise is *collateral* to the contract the parties executed; if the promise concerned the performance of the contract itself, the fraud claim is subject to dismissal as duplicative of the claim for breach of contract." *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 941 N.Y.S.2d 59, 74 (1st Dep't 2012) (emphasis in original); *see also Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) (noting that although a fraud claim may not generally be used "as a means of restating what is, in substance, a claim for breach of contract," New York law "specifically recognizes causes of action for fraud in the inducement when the misrepresentation is collateral to the contract it induced") (citation omitted).

22

Defendants argue that Schaffer's fraud claim is premised on an alleged breach of contract, and thus barred under this rule.  (Def. Br. at 10).  But this is not the case.  Although the Amended Complaint does assert a claim for breach of contract, Schaffer's fraudulent inducement claim is not a mere mirror image of his contract claim.  In his contract claim, Schaffer alleges that Defendants breached the Employment Agreement by not giving him the duties specified in Exhibit A, by not giving him additional shares of GeneDx stock, and by discriminating against him and wrongfully terminating him.  (Compl. ¶¶ 115–20).  By contrast, Schaffer's fraudulent inducement claim alleges that Defendants misrepresented their intention to give him responsibility for all legal and regulatory activities, which he understood included FDA/Governmental Affairs matters and selection of outside counsel.  (*Id.* ¶¶ 102–13).  These alleged misrepresentations took place in pre-hiring discussions between Schaffer and GeneDx representatives and concern matters that, as Defendants themselves note (Def. Br. at 2; Def. Reply at 5), are not embraced within the list of duties on Exhibit A.

Under these circumstances, the alleged false promises underlying Schaffer's fraudulent inducement claim are more properly viewed as "collateral" to the Employment Agreement.  *See, e.g.*, *Cohen v. Avanade Inc.*, 874 F. Supp. 2d 315, 318, 323 (S.D.N.Y. 2012) (finding that alleged oral misrepresentations made to plaintiff by defendant's executives during the recruitment process were collateral to the contract); *Stamelman*, 2003 WL 21782645, at *5 (fraudulent inducement claim not barred where plaintiff relied on pre-hiring representations that "were not part of

the terms of the employment agreement" and thus were collateral to the agreement).

Further, the Amended Complaint alleges that Stueland and Ryan, at the time they made the promises underlying Schaffer's fraudulent inducement claim, had no intention of fulfilling those promises. (*See, e.g.*, Compl. ¶ 106 (alleging that promises that Schaffer would be responsible for overseeing all legal and regulatory matters "were untrue and known to be untrue at the time they were made to Plaintiff")). Therefore, contrary to Defendants' argument, the alleged misrepresentations do involve representations of existing fact that are actionable in fraud. *See Stamelman*, 2003 WL 21782645, at *6 ("[Plaintiff's] allegations that [defendant], at the time it made the future promises, 'knew them to be false,' renders those representations allegations of existing fact").[8]

Consequently, Schaffer's fraudulent inducement claim is not subject to dismissal on the ground that it rests on nonactionable promises rather than representations of existing fact. That said, in order to properly plead such a claim, Schaffer must do more than make conclusory allegations that Defendants knew their promises were false and intended to defraud him. For the reasons set forth above (Discussion § A.1), he has not done so.

---

[8] Defendants' cases are not to the contrary. *Tradeshift, Inc. v. Smucker Servs. Co.*, No. 20 Civ. 3661 (MKV), 2021 WL 4463109, at *5 (S.D.N.Y. Sept. 29, 2021), simply cites the general rule that "[a]n actionable claim for fraudulent inducement must allege the representations of present fact, not of future intent," but as noted above, Schaffer's fraudulent inducement claim comports with this rule. Similarly, *Clean Energy Experts v. Benhammou*, No. 23 Civ. 1940 (DEH), 2024 WL 196507 (S.D.N.Y. Jan. 18, 2024), dismissed fraud claims that rested on Defendants' misrepresentations that they would pay for the goods they purchased under the parties' purchase agreements and that, consequently, were not collateral to the contract. *Id.* at *1, *3. That is not the case here.

### 3. Merger Clause

Next, GeneDx argues that Schaffer's fraudulent inducement claim is precluded by a merger clause in the Agreement.  (Def. Br. at 11–12).  The Court disagrees.

In certain circumstances, the existence of a merger clause may, as a matter of law, preclude a plaintiff from establishing the element of reasonable reliance necessary to support a fraudulent inducement claim.  In analyzing the effect of a merger clause, New York courts distinguish between a "general merger clause" and "specific disclaimers of reliance."  *Liani v. Baker*, Nos. 09 Civ. 2651, 09 Civ. 2652 (ILG), 2010 WL 2653392, at *5 (E.D.N.Y. June 28, 2010).  "[A] general merger clause does not, standing alone, preclude a claim of fraudulent inducement."  *Robinson v. Deutsche Bank Tr. Co. Americas*, 572 F. Supp. 2d 319, 323 (S.D.N.Y. 2008).  A merger clause is "general" when it resembles "an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made."  *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993) (internal quotation omitted); *see Essex Cap. Corp. v. Garipalli*, No. 17 Civ. 6347 (JFK), 2018 WL 6618388, at *6 (S.D.N.Y. Dec. 18, 2018).  "When, however, the contract states that a contracting party disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations."  *Yanakas*, 7 F.3d at 315 (emphasis added).

Some courts in this Circuit have found that "the specificity requirement may be relaxed (or even altogether disregarded) when the clause and its surrounding contract were the product of arm's-length negotiations between sophisticated parties." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 488 (S.D.N.Y. 2017); *see, e.g., Transnational Mgmt. Sys. II, LLC v. Carcione*, No. 14 Civ. 2151 (KBF), 2016 WL 7077040, at *7 n.8 (S.D.N.Y. Dec. 5, 2016) ("The specificity requirement is further relaxed when the contracting parties are 'sophisticated business people,' and the disclaimer clause is the result of negotiations between them." (citation omitted)); *Primedia Enthusiast Publ'n Inc. v. Ashton Int'l Media, Inc.*, No. 02 Civ. 9997 (HB), 2003 WL 22220375, at *6 (S.D.N.Y. Sept. 25, 2003) ("Notwithstanding the lack of an explicit disclaimer of representations that form the basis of a fraud-in-the-inducement claim, courts may disregard a fraudulent inducement claim and give effect to a contract when the parties have negotiated at arms lengths and they are sufficiently sophisticated that they could have easily protected themselves either through obtaining readily available information or alternatively including a protective clause in the agreement.").

"In particular, some courts have held that a decision by sophisticated parties to include specific representations and warranties in their agreements in addition to a merger clause disclaiming all other representations was sufficient to bar a fraud claim, at least when the specific representations are extensive in number." *PetEdge*, 234 F. Supp. 3d at 489 (collecting cases); *see also McBeth v. Porges*, 171 F. Supp. 3d 216, 225 (S.D.N.Y. 2016) ("New York courts have routinely enforced

26

merger and non-reliance clauses against sophisticated plaintiffs to deny extra-contractual claims that require a showing of reasonable reliance."); *Elite Physician Servs., LLC v. Citicorp Payment Servs., Inc.*, No. 06 Civ. 2447 (BSJ), 2009 WL 10669137, at *8 (S.D.N.Y. Oct. 9, 2009) (where a sophisticated party had signed an agreement with a general "merger clause [ ] intended to preclude either party from relying on previous statements, written or oral," that party's "supposed reliance on [prior] representations simply could not be reasonable under [ ] New York . . . law").

Here, the merger clause states that the Agreement "set[s] forth the entire understanding of the parties hereto with respect to the employment of [Schaffer] by the Company" and that "[a]ny and all other previous agreements and understandings between or among the parties regarding the subject matter hereof, whether written or oral, are hereby released, merged herein and superseded by this Agreement." (Agmt. § 14(D)). As Schaffer argues (Pl. Br. at 5), this is the sort of general merger clause that courts typically deem insufficient to bar a fraudulent inducement claim. *See, e.g.*, *Hernandez v. Money Source Inc.*, No. 17 Civ. 6919 (GRB) (AKT), 2021 WL 1402257, at *14 (E.D.N.Y. Mar. 5, 2021) (clause providing that "employment terms supersede any other agreements, understandings, promises, or communications, written or oral, by or on behalf of the Company" too general and vague); *Thayer v. Dial Indus. Sales, Inc.*, 85 F. Supp. 2d 263, 272 (S.D.N.Y. 2000) (clause stating that contract "represents the entire agreement between the parties with respect to Employee's employment with the Corporation" too general); *Chase v. Columbia Nat'l Corp.*, 832 F. Supp. 654, 662 (S.D.N.Y.

27

1993) (clause providing that contract "supersedes all prior agreements and understandings between the parties relating to the subject matter of this Agreement" was general).

GeneDx does not dispute that the clause in the Agreement is a general merger clause. Nevertheless, GeneDx argues that Schaffer's fraud claim must be dismissed because, as an attorney, he is a sophisticated party and "a general merger clause prevents sophisticated parties from relying on parol[] evidence to support a fraudulent inducement claim." (Def. Reply at 8; *see* Def. Br. at 12). GeneDx cites *Junk v. Aon Corp.*, No. 07 Civ. 4640 (LMM) (GWG), 2007 WL 4292034 (S.D.N.Y. Dec. 3, 2007), where the court dismissed a fraudulent inducement claim brought by a former employee on the basis of a merger clause, finding, *inter alia*, that the plaintiff "is an attorney, and therefore considered a sophisticated party within the eyes of this Court." *Id.* at *7.

However, contrary to GeneDx's argument, courts have not found that sophisticated parties are invariably prohibited—especially at the motion to dismiss stage—from bringing claims of fraud-in-the-inducement in the face of a general merger clause. "'New York courts are generally skeptical of claims of reliance asserted by 'sophisticated businessmen engaged in major transactions who enjoy access to critical information but fail to take advantage of that access.' But that skepticism does not transform the factual question of reasonableness into a legal one." *Sanmina Corp. v. Dialight PLC*, No. 19 Civ. 11712 (KPF), 2023 WL 9022882,

28

at \*10 (S.D.N.Y. Dec. 29, 2023) (quoting *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007) (cleaned up).

As the Second Circuit has emphasized, "the issue of reasonable reliance requires that [a court] consider 'the entire context of the transaction, including . . . its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them.'" *FIH, LLC v. Found. Cap. Partners LLC*, 920 F.3d 134, 141 (2d Cir. 2019) (quoting *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006)); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 193 (2d Cir. 2003) (considering other factors including the plaintiff's ability to protect itself by insisting that representations be included in the contract, the extensive contractual representations about other matters, and the size of the transaction, in addition to the plaintiff's sophistication, in holding that general merger clause precluded a finding of reasonable reliance). This is "a nettlesome and fact intensive question, and thus is often a question of fact for the jury rather than a question of law for the court." *FIH*, 920 F.3d at 141 (internal citations and quotation marks omitted).

In *FIH*, the Second Circuit rejected the argument that "even *general* merger clauses (as opposed to disclaimers) . . . can defeat reasonable reliance when an investor is sophisticated and the representations at issue are not contained in the operative agreement." *Id.* at 142–43 (emphasis in original). While a merger clause "operates to limit the universe of the parties' contractual obligations to the text of the contract itself," the court explained, this "does not mean . . . that a merger

29

clause serves as a catch-all disclaimer of reliance on any conceivable pre-contract misrepresentations about facts pertaining to the subject matter of the contract that could form the basis of a claim for fraud in the inducement." *Id.* at 143. The court acknowledged "there may be circumstances where a general disclaimer or merger clause, together with an extensive roster of specifically negotiated factual warranties and representations, can lead to a conclusion that, in the particular circumstances of a case, no reasonable jury could find reasonable reliance on a representation not inserted into the written contract." *Id.* at 144. But the court found that the general merger clause in *FIH* did not prevent the plaintiff's reasonable reliance on defendants' alleged misrepresentations as a matter of law, even though it was undisputed that the plaintiff—the general partner of a private equity fund—was a sophisticated investor. *Id.* at 136, 140, 141.

Here, the reasonableness of Schaffer's reliance on the alleged extra-contractual representations presents an issue of fact that cannot be decided on a motion to dismiss. The merger clause is concededly a general one, which does not purport to disclaim Schaffer's reliance on any particular pre-contract representation or type of representations. Nor do the oral representations claimed by Schaffer directly contradict the specific terms of the parties' Agreement. *See Harsco Corp. v. Segui*, 91 F.3d 337, 345 (2d Cir. 1996) (dismissing fraudulent inducement claim because allegations of fraud were directly contradicted by specific contractual disclaimers). At this juncture of the case, there are no facts before the Court indicating the nature and length of the parties' negotiations over the Agreement,

30

whether Schaffer had a meaningful opportunity to make changes to the Agreement, the degree of Schaffer's sophistication, or other facts relevant to the context of Schaffer's hiring. Accordingly, the Court declines to dismiss Schaffer's fraudulent inducement claim on the basis of the merger clause.

### 4. Pecuniary Loss

Finally, GeneDx argues that Schaffer's fraudulent inducement claim must be dismissed because he fails to plead "actual pecuniary loss" in accordance with the out-of-pocket rule for fraud damages. (Def. Br. at 12–13). Schaffer failed to respond to this specific argument in his opposition brief. (*See* Pl. Br. at 2–6). Nevertheless, the Court will examine GeneDx's argument on its merits, especially as it is evident that Schaffer has not abandoned his fraudulent inducement claim altogether.

"Under New York law, damages for claims of fraud and fraudulent inducement are subject to the 'out-of-pocket rule,' which confines plaintiffs to recovering losses actually sustained instead of expected profits." *Virola v. XO Commc'ns, Inc.*, No. 05 Civ. 5056 (JG) (EGR), 2008 WL 1766601, at *15 (E.D.N.Y. Apr. 15, 2008); *see also Schonfeld v. Hilliard*, 218 F.3d 164, 183 (2d Cir. 2000) (noting that "[u]nder New York law, the measure of damages for fraud is governed by the 'out-of-pocket' rule") (quotation omitted); *Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 392 F. Supp. 3d 382, 398 (S.D.N.Y. 2019) (noting that the out-of-pocket rule "limits damages for fraud-based claims to 'the actual pecuniary loss sustained as the direct result of the wrong'" (quoting *Norast S.ar.l. v. Castle Harlan, Inc.*, 147 A.D.3d 666, 48 N.Y.S.3d 95, 97 (1st Dep't 2017))).

As a result of the alleged fraudulent inducement, Schaffer claims damages in the form of "lost wages, benefits, and incentives at another company which Plaintiff left" (*i.e.*, Cardinal Health) to go work for Defendants.  (Compl. ¶ 112).  Defendants argue that damages "based on what [Schaffer] might have earned had he remained in his prior position" do not allege a legally cognizable injury, as "'injury based on Plaintiff's prior income is the kind of injury claim barred by the out-of-pocket rule.'" (Def. Br. at 12–13 (quoting *Knutson v. G2 FMV, LLC*, No. 14 Civ. 1694 (RWS), 2018 WL 286100, at *5 (S.D.N.Y. Jan. 3, 2018)); Def. Reply at 4).  Defendants, however misread the case law.

Courts routinely hold that a "loss of benefits flowing from one's previous employment" is a form of "cognizable loss[] in employment-related fraudulent inducement cases." *Kwon v. Yun*, 606 F. Supp. 2d 344, 360–61 (S.D.N.Y. 2009) (Lynch, J.) (collecting cases); *see, e.g.*, *Leidl v. Please Hold (UK) Ltd.*, No. 17 Civ. 6134 (JSR), 2018 WL 1089748, at *5 (S.D.N.Y. Feb. 2, 2018) (where plaintiffs were fraudulently induced to quit employment, they were "entitled to any damages they actually suffered in the form of lost wages" from their former jobs); *Koegel v. PH Media (USA), Inc.*, No. 17 Civ. 6133 (AKH), 2018 WL 11315383, at *4 (S.D.N.Y. Mar. 30, 2018) (recognizing that a plaintiff in a fraudulent inducement case may "recover damages for lost wages tied to a previous job"); *Ferguson v. Ferrante*, No. 13 Civ. 4468 (VEC), 2015 WL 14075030, at *13 (S.D.N.Y. Oct. 8, 2015) (awarding damages in the form of "compensation from [his prior employer] that [plaintiff] would have earned" had he not been fraudulently induced to join new employer, less

32

amount he was paid by new employer); *Hyman v. Int'l Business Machines Corp.,* No. 98 Civ. 1371 (JSM), 2000 WL 1538161, at *4 (S.D.N.Y. Oct. 17, 2000) (concluding that although damages for fraudulent inducement are limited to out-of-pocket losses, such damages could be calculated based on how long plaintiffs likely would have remained at their prior place of employment); *Caron v. Travelers Corp.,* No. 96 Civ. 6236 (DC), 1998 WL 395319, at *5 (S.D.N.Y. July 15, 1998) (denying motion for summary judgment given material issue of fact "as to how much longer" plaintiff would have stayed at prior employer "but for [defendant's] alleged fraudulent conduct" in inducing plaintiff to change jobs); *Laduzinski v. Alvarez & Marsal Taxand LLC*, 132 A.D.3d 164, 16 N.Y.S.3d 229, 232 (1st Dep't 2015) (rejecting defendants' argument that plaintiff's alleged damages were too "speculative" where they stemmed "from his loss of employment with J.P. Morgan," plaintiff's prior employer, which he left to work for defendants); *Navaretta v. Group Health Inc.,* 191 A.D.2d 953, 595 N.Y.S.2d 839, 841 (3d Dep't 1993) (noting that a plaintiff who prevails on a fraudulent inducement claim in the employment context "could conceivably recover for loss of benefits and salary connected with her *former* employment, as opposed to that which she would have received if her employment with defendant had continued") (emphasis in original).

In the face of this authority, Defendants' reliance on *Knutson* is unavailing. Although the court in *Knutson* granted a motion to dismiss a fraudulent inducement claim for failure to adequately plead damages, and did so on the ground that "injury based on Plaintiff's prior income [tied to his salary at his prior employer] is the kind

of injury claim barred by the out-of-pocket rule," *Knutson*, 2018 WL 286100, at *5,

the decision did not mention or address the line of cases cited above holding that

such damages are permissible under the out-of-pocket rule.[9]  Instead, citing a single

case, the court reasoned that "'[a] plaintiff may only recover what he lost because of

the fraud, not what he might have gained.'"  *Id.* (quoting *Pasternak v. Dow Kim*, 961

F. Supp. 2d 593, 597 (S.D.N.Y. 2013) (cleaned up)).

But that rationale is untenable if applied, as Defendants seek to do here, to

create a blanket rule prohibiting fraudulent inducement damages based on the

plaintiff's salary and benefits from a former employer.  If the plaintiff would have

earned more money by staying with his former employer, and would have done so

but for the defendant's fraud, then he *has* suffered "actual pecuniary loss" of the

kind traditionally compensable under the out-of-pocket rule.  *See Laduzinski*, 16

N.Y.S.3d at 232 (describing such damages as "the sum necessary for restoration to

the position occupied before the commission of the fraud") (citation omitted);

*Hyman*, 2000 WL 1538161, at *4 (describing such damages as "out-of-pocket losses

incurred as a direct result of the misrepresentation").  In other words, the income

from the plaintiff's prior employer (less his income from the new employer) is "what

he lost because of the fraud."  *Pasternak*, 961 F. Supp. 2d at 597.

*Pasternak* illustrates these principles.  In *Pasternak*, Judge Chin—who had

previously upheld a similar damages claim on the same theory, *see Caron,* 1998 WL

395319, at *5—recognized the holdings in *Kwon* and similar cases allowing recovery

---

[9] The plaintiff's brief in *Knutson* did not cite any of these cases.  *See Knutson*, No. 14 Civ. 1694
(RWS), Docket No. 138 at 7–9.

based on income from a prior employer. *See Pasternak*, 961 F. Supp. 2d at 597 n.4.

He distinguished them on the ground that "[t]he plaintiffs in these cases were

actually employed and thus there was a more concrete basis for determining

damages," whereas the plaintiff in *Pasternak* "was not employed" at the time he

went to work for the defendant, *id.* at 597–98, and instead was seeking "expectation

damages" based on the income plaintiff claimed he "would have earned had he

accepted" a different offer from another prospective new employer, *id.* at 596–97.

Here, as in *Kwon* (but not *Pasternak*), Schaffer was "actually employed" at Cardinal

Health before joining GeneDx and thus should be able to point to a "concrete basis"

for determining what he would have earned had he stayed there.  He is therefore

eligible for damages based on this lost income. *See Leidl*, 2018 WL 1089748, at *5

("Plaintiffs . . . seek lost salary from jobs that they actually held and that they quit

for a new job with [the defendant-employer] on the basis of defendants['] [ ]

misrepresentations.  In such a situation, plaintiffs are entitled to any damages they

actually suffered in the form of lost wages.").

Further, as Judge Haight explained in denying a motion to dismiss based on

an argument similar to that made by Defendants here: "It is of course well settled

that damages may not be recovered if, in the circumstances of the case, they are

speculative or remote." *Doelha v. Wathne Ltd., Inc.*, No. 98 Civ. 6087 (CSH), 2000

WL 987280, at *6 (S.D.N.Y. July 17, 2000).  But this does not "preclude[] one who is

fraudulently induced to contract with another from ever basing a damages claim on

an alternative economic opportunity that he gave up in order to deal with the

35

tortfeasor." *Id.* "Whether a particular loss is uncompensable because too speculative or remote is fact-intensive. If the proof is there, a defrauded plaintiff may base a claim for actual pecuniary loss upon an economic opportunity that the defendant fraudulently induced him to forego." *Id.*

Defendants' complaint that the amount of Schaffer's claimed damages remains "unspecified" (Def. Br. at 12–13) also misses the mark. A plaintiff "is not required to calculate damages at the pleading stage," *Bell Semiconductor, LLC v. Broadcom Corp.*, No. 24 Civ. 156 (ER), 2024 WL 5118494, at *7 (S.D.N.Y. Dec. 16, 2024), and the issue of "'whether the plaintiff has proven [its] damages with a reasonable certainty . . . is an issue of *proof* rather than an issue of pleading.'" *EMR (USA Holdings) Inc. v. Goldberg*, No. 18 Civ. 7849 (ER), 2020 WL 4038358, at *10 (S.D.N.Y. July 17, 2020) (quoting *Sporre S.A. de C.V. v. Int'l Paper Co.*, No. 99 Civ. 2638 (HB), 1999 WL 1277243, at *9 (S.D.N.Y. Dec. 30, 1999) (emphasis in original)); *see also Red Oak Fund, L.P. v. MacKenzie Partners, Inc.,* 90 A.D.3d 527, 934 N.Y.S.2d 401, 403 (1st Dep't 2011) ("Although plaintiff may not in the end be able to prove its damages with reasonable certainty, 'a determination to that effect at this juncture [on a motion to dismiss] would be premature.'" (quoting *Morris v. Putnam Berkley, Inc.,* 259 A.D.2d 425, 687 N.Y.S.2d 139, 140 (1st Dep't 1999))); *Hyman*, 2000 WL 1538161, at *4 ("While [Defendant] argues that Plaintiffs have in fact suffered no losses due to their subsequent earnings and severance packages, such determinations are appropriately made by the finder of fact.").

Accordingly, had Schaffer sufficiently alleged the other elements of a fraudulent inducement claim, the claim would not be subject to dismissal for failure to plead a cognizable theory of damages.

## B. Breach of Contract Claim

Although less than clear, Schaffer's breach of contract claim appears to allege that Defendants breached his Employment Agreement in the following ways: by not assigning him the duties listed in Exhibit A, "severely limit[ing]" his role, and then terminating him without cause "in spite of his good performance" (Compl. ¶ 117); by terminating him in order "to deprive him of the right to receive" additional GeneDx shares (*id.* ¶ 118); and by "discriminating against him and wrongfully terminating him due to discriminatory motivations" (*id.* ¶ 119).  As a result, he alleges that he "has suffered damages and losses and has been denied the benefit of the bargain he made . . . includ[ing] the loss of his employment and therefore the loss of his compensation."  (*Id.* ¶¶ 122–23).

To state a claim for breach of contract under New York law,[10] a party must allege: (i) the existence of a contract; (ii) performance of the contract by one party; (iii) breach by the defendant; and (iv) damages attributable to that breach. *Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, 438 F. App'x 20, 21–22 (2d Cir. 2011); *Khen v. US Coachways, Inc.*, No. 23 Civ. 10762 (JLR), 2025 WL 252901, at *9 (S.D.N.Y. Jan. 21, 2025).  "'A breach of contract claim will be dismissed, however, as being too vague and indefinite, where the plaintiff fails to allege, in nonconclusory

---

[10] As the Agreement contains a New York choice-of-law clause, the Court applies New York law in analyzing Schaffer's breach of contract claim.  (*See* Agmt. § 14(A)).

37

fashion, the essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated.'" *Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 468 (S.D.N.Y. 2016) (quoting *Highlands Ins. Co. v. PRG Brokerage, Inc.*, No. 01 Civ. 2272 (GBD), 2004 WL 35439, at *8 (S.D.N.Y. Jan. 6, 2004)).  "[A] plaintiff does not meet the *Twombly-Iqbal* standard and [a breach of contract claim] must be dismissed when 'the Complaint does not specify which clause of the [a]greement [d]efendant is alleged to have breached.'" *Id.* (quoting *Swan Media Group, Inc. v. Staub*, 841 F. Supp. 2d 804, 807 (S.D.N.Y. 2002)).

GeneDx argues that Schaffer's breach of contract claim fails to specify the contractual provision breached by Defendants, and must be dismissed on that basis. (Def. Br. 13–14).  The Court agrees.

Other than pointing to the list of duties in Exhibit A, Schaffer's breach of contract claim nowhere identifies any particular provision of the Agreement that he claims was breached by GeneDx.  (*See* Compl. ¶¶ 116, 119).  Nor does he identify which, if any, of the various duties listed in Exhibit A form the basis for his claim of breach.  This is insufficient.  "[A] plaintiff *must identify the specific provision of the contract that was breached* as a result of the acts at issue."  *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002) (emphasis added), *aff'd*, 65 F. App'x 736 (2d Cir. 2003).  Citation merely to the contract or a broad set of obligations within the contract is insufficient to meet this burden.  *See, e.g.*, *Hudson Neurosurgery, PLLC v. UMR, Inc.*, No. 20 Civ. 9642 (KMK), 2022 WL 902107, at *4 (S.D.N.Y. Mar. 28, 2022) (dismissing breach of contract claim where plaintiff only

alleged that defendant "breached the terms" of the contract).  Accordingly, Schaffer's citation to the full list of duties in Exhibit A, without explaining which provision(s) were breached by Defendants, does not satisfy his pleading burden.

Nor does a review of the Agreement indicate any provision that may have been breached by virtue of the conduct alleged by Schaffer.  Schaffer claims that GeneDx did not assign him the full list of duties referred to in Exhibit A and limited his role (Compl. ¶ 117), but the Agreement imposes no obligation on GeneDx to assign him any particular duties.  Rather, it imposes an obligation *on Schaffer* to *perform* the duties of a General Counsel: "*the Executive* [*i.e.,* Schaffer] *shall perform* the duties commensurate with those of a General Counsel, including without limitation those listed on Exhibit A hereto."  (Agmt. § 1(A); emphasis added). Further, although Schaffer claims he was not allowed to choose outside counsel and was not assigned responsibility for FDA/Governmental Affairs, nothing in the Agreement or Exhibit A required GeneDx to assign him those duties.

Equally unavailing is Schaffer's complaint that GeneDx terminated him despite his "good performance."  (Compl. ¶ 117).  The Agreement imposes no obligation on GeneDx to continue to employ Schaffer as its General Counsel so long as his performance meets expectations.  To the contrary, Section 5(B)(iv) of the Agreement expressly gives GeneDx the right "at the election of the Company to terminate this Agreement *without Cause*" upon 60 days' notice.  (Agmt. § 5(B)(iv); emphasis added).  Under this unambiguous language, GeneDx was entitled to terminate Schaffer's employment regardless of his performance.  *See, e.g., Keeney v.*

39

*Kemper Nat'l Ins. Cos.*, 960 F. Supp. 617, 619, 624 (E.D.N.Y. 1997) (dismissing breach of contract claim despite plaintiff's allegations that he "generated a large volume of business for the defendants" and "has been and is still ready and willing to perform said services," as defendants "possessed the absolute right to terminate the agreement without cause by giving the requisite 180 days notice").

Schaffer fares no better with his argument that he was to be given additional shares of GeneDx stock, "which he lost out on with his termination." (Pl. Br. at 7; *see* Compl. ¶ 118). As Defendants accurately point out (Def. Reply at 7), Schaffer does not allege that he was contractually entitled to these shares, and instead acknowledges that his shares award was made "at the direction of the compensation committee." (Compl. ¶ 72). Nor does Schaffer allege that the Agreement obligated GeneDx to provide him with those shares in the event he was terminated. The Agreement spells out the benefits to which Schaffer would be entitled upon his termination, and those benefits do not include any stock awards. (Agmt. § 5(B), (C)). Further, Schaffer's "belie[f]" that Stueland terminated him for the purpose of depriving him of his shares (Compl. ¶ 118) does not help him state a claim. *See In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 470 (S.D.N.Y. 2013) (noting that New York courts have recognized that a party has an "'absolute, unqualified right'" to invoke an unconditional termination clause "'without court inquiry into whether the termination was activated by an ulterior motive.'" (quoting *Triton Partners LLC v. Prudential Sec. Inc.*, 301 A.D.2d 411, 752 N.Y.S.2d 870, 870–71 (1st Dep't 2003))); *see also Schwartz v. Fortune Magazine*, 89 F. Supp. 2d 429,

434 (S.D.N.Y. 1999) ("[T]he court does not inquire into why a party exercised his right to terminate a contract when the contract is terminable without cause").

Finally, Schaffer's claim that he was terminated for discriminatory reasons also does not allege a breach of the Agreement. "Although it is unlawful for an employer to terminate an employee for discriminatory reasons, the proper remedy for a person aggrieved in this manner is not a cause of action for breach of contract." *Benson v. N. Shore-Long Island Jewish Health Sys.*, 482 F. Supp. 2d 320, 331 (E.D.N.Y. 2007). Thus, "[t]o the extent Plaintiff's breach of contract cause of action stems out of an allegation of wrongful termination, the claim should be dismissed." *Tolani v. Carl C. Burnett Funeral Home, Inc.*, No. 20 Civ. 2169 (JS) (JMW), 2022 WL 21828624, at *13 (E.D.N.Y. Aug. 9, 2022). As courts in this Circuit have made clear, "[t]here is no need . . . to rehash [ ] discrimination claims through an additional cause of action for breach of contract." *Parker v. BJ's Wholesale Club, Inc.*, No. 13 Civ. 6065 (JS) (SIL), 2015 WL 1247066, at *5 (E.D.N.Y. Mar. 18, 2015).

In short, it is not enough for Schaffer to point to allegedly unfair, unseemly, or even unlawful actions by Defendants and pronounce them a "breach" of his Employment Agreement. For Defendants to face contractual liability, their actions must have contravened a duty imposed on them by the terms of the Agreement. Because Schaffer does not plausibly allege that Defendants violated any term of the Agreement, he does not state a claim for breach of contract.

### C. Breach of Covenant of Good Faith and Fair Dealing Claim

"Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011). This implied covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (quoting *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 746 N.Y.S.2d 131, 773 N.E.2d 496, 500 (2002)). The covenant "'is breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under the agreement.'" *Williamson Acquisition, Inc. v. PNC Equity Mgmt. Corp.*, Nos. 03 Civ. 6666T, 04 Civ. 6259T (MAT), 2010 WL 276199, at *7 (W.D.N.Y. Jan. 15, 2010) (quoting *Skillgames, LLC v. Brody*, 1 A.D.3d 247, 767 N.Y.S.2d 418, 422 (1st Dep't 2003)), *aff'd sub nom. Argilus, LLC v. PNC Fin. Servs. Grp., Inc.*, 419 F. App'x 115 (2d Cir. 2011).

Schaffer alleges that GeneDx breached the implied covenant of good faith and fair dealing by "discriminating against" him in the terms and conditions of his employment. (Compl. ¶¶ 128–29). As with his breach of contract claim, Plaintiff alleges damages on this claim based on being "denied the benefit of the bargain he made . . . includ[ing] the loss of his employment and therefore the loss of his compensation." (*Id.* ¶¶ 129–30). In his opposition brief, Schaffer specifies that "Defendants sought to deprive [Plaintiff] of his full compensation, benefits, and

42

shares.  In particular, his additional shares would be given to a White female executive team member."  (Pl. Br. at 9).

GeneDx argues that Schaffer's breach of the implied covenant claim should be dismissed as redundant and duplicative of his breach of contract claim.  (Def. Br. at 15–16).  Schaffer's opposition brief fails to explicitly respond to Defendants' argument on this point.  (*See* Pl. Br. at 8–9).  The Court agrees with Defendants that Schaffer's implied covenant claim is impermissibly duplicative of his breach of contract claim.

"New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013).  Additionally, "'where the relief sought by the plaintiff in claiming a breach of the implied covenant of good faith is intrinsically tied to the damages allegedly resulting from the breach of contract, there is no separate and distinct wrong that would give rise to an independent claim.'"  *Cordell v. McGraw-Hill Cos.*, No. 12 Civ. 637 (ALC) (RLE), 2012 WL 5264844, at *4 (S.D.N.Y. Oct. 23, 2012) (quoting *ARI & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003)); *see also Casalino Interior Demolition Corp. v. Custom Design Data, Inc.*, 235 A.D.2d 514, 653 N.Y.S.2d 35, 36 (2d Dep't 1995).

Schaffer's Amended Complaint alleges that GeneDx breached the implied covenant "[b]y discriminating against Plaintiff."  (Compl. ¶ 129).  This mirrors his allegations on the breach of contract claim, which contends that "Defendants

43

further breached Plaintiff's employment agreement by discriminating against him[.]" (*Id.* ¶ 119). Schaffer also pleads the same damages on both claims, namely, that he "suffered damages and losses and [was] denied the benefit of [his] bargain . . . includ[ing] the loss of his employment and therefore the loss of his compensation." (*Id.* ¶¶ 122, 130). Schaffer's breach of the implied covenant claim, therefore, rests on the same factual grounds and requests the same relief as his breach of contract claim. The claim is plainly duplicative of his breach of contract claim.

Moreover, that the Court recommends dismissal of Schaffer's breach of contract claim on other grounds does not provide a basis to keep alive his breach of implied covenant claim. *See Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 583 (2d Cir. 2020) ("Plaintiff's only response was to argue that it was error to dismiss the good-faith-based claim where the breach of contract claim was also dismissed. The District Court rejected that argument. We find no error by the District Court."); *Apogee Handcraft, Inc. v. Verragio, Ltd.*, 155 A.D.3d 494, 65 N.Y.S.3d 27, 29 (1st Dep't 2017) (dismissing breach of contract claim for failure to establish breach or damages, and then dismissing breach of implied covenant claim as redundant); *Empire State Bldg. Assocs. v. Trump*, 247 A.D.2d 214, 669 N.Y.S.2d 205, 205 (1st Dep't 1998) (dismissing breach of contract and breach of implied covenant claims "on the grounds that the former fails to adequately allege any breach of contract, and the latter merely duplicates the former"); *Nader v. ABC Television, Inc.*, 330 F. Supp. 2d 345, 349 (S.D.N.Y. 2004) (dismissing breach of implied covenant claim as "entirely duplicative of [plaintiff's] breach of contract

44

claim," which was dismissed on finding of no breach), *aff'd*, 150 F. App'x 54 (2d Cir. 2005); *Kamfar v. New World Rest. Grp., Inc.*, 347 F. Supp. 2d 38, 52 (S.D.N.Y. 2004) (dismissing breach of implied covenant claim as "entirely duplicative" of breach of contract claim that was dismissed on other grounds).

Further, even if Schaffer's breach of implied covenant claim were not duplicative of his breach of contract claim, it would still be subject to dismissal. As noted above, Schaffer may not predicate a claim for breach of contract on GeneDx's alleged discriminatory treatment of him. He is likewise precluded from relying on such allegations to support a claim for breach of the implied covenant of good faith and fair dealing. "To the extent the alleged unlawful conduct falls outside the scope of the contract, it may not form the basis of either a breach-of-contract claim *or* a claim for breach of the implied covenant of good faith and fair dealing." *Long v. Marubeni Am. Corp.*, No. 05 Civ. 639 (GEL), 2006 WL 1716878, at *1 (S.D.N.Y. June 20, 2006) (emphasis in original) (dismissing good faith and fair dealing claim based on employer's alleged "discriminatory and retaliatory conduct"); *see also Benson*, 482 F. Supp. 2d at 331 (rejecting plaintiff's argument that employer's discriminatory conduct breached an implied promise that she would be treated fairly and in good faith and not discriminated against).

Schaffer's claim also conflicts with case law holding that a party's contractual right to terminate without cause, such as GeneDx enjoys under Section 5(B)(iv) of the Agreement, may not be constrained by the covenant of good faith and fair dealing. *See In Touch Concepts*, 949 F. Supp. 2d at 470–71 (dismissing plaintiff's

45

claim that defendant's bad-faith termination of contract breached covenant of good faith and fair dealing where contract unambiguously permitted defendant to terminate without cause upon notice, since "an obligation cannot be implied which is inconsistent with or negates the express terms of the contract"); *see also Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989) (affirming district court's reading of contract allowing for termination "for any cause" as one allowing for "at will termination" and refusing to read in an implied "good faith" or "good cause" requirement).

Accordingly, Schaffer's claim for breach of the implied covenant of good faith and fair dealing should be dismissed.

## D. Race and Sex Discrimination Claims

Schaffer asserts nine claims under federal, New York state and city, and Connecticut anti-discrimination laws.  These include five race-based discrimination claims under Title VII, § 1981, the NYSHRL, the NYCHRL, and the CFEPA (Counts 4 through 8), and four sex-based discrimination claims under Title VII, the NYSHRL, the NYCHRL, and the CFEPA (Counts 9 through 12).  Broadly speaking, Schaffer alleges that he was unlawfully terminated on account of his race and sex and subjected to other adverse employment actions and a hostile work environment based on these protected characteristics.  (*See* Compl. ¶¶ 132–99).

Defendants argue that Schaffer's claims under the NYSHRL, the NYCHRL, and the CFEPA are beyond the jurisdictional reach of those statutes, because Schaffer worked remotely from Ohio and the impact of the allegedly discriminatory

treatment was felt in Ohio, and not in New York or Connecticut.  (Def. Br. 16–17).

Defendants also argue that Schaffer fails to sufficiently plead a *prima facie* case of

discrimination under any of the federal, state, and local laws he invokes.  (*Id.* at 17–

23).  The Court first considers whether the New York and Connecticut laws apply in

this case, and then addresses whether Schaffer has stated a claim under any

applicable anti-discrimination law.

### 1. Applicability of State and Local Laws

#### a. NYSHRL and NYCHRL

"NYSHRL and NYCHRL . . . afford protections unavailable under federal law

to discrimination plaintiffs who can 'plead and prove that the alleged discriminatory

conduct had an impact' within the state and city respectively." *McLeod v. Jewish

Guild for the Blind*, 864 F.3d 154, 157 (2d Cir. 2017) (per curiam) (quoting *Hoffman

v. Parade Publ'ns*, 15 N.Y.3d 285, 907 N.Y.S.2d 145, 933 N.E.2d 744, 746 (2010)).[11]

A non-resident plaintiff is not able to invoke these protections "'when the alleged

discriminatory conduct did not have an impact on the plaintiff within New York

City (regarding the NYCHRL) and within New York State (regarding the

NYSHRL).'" *Dittes v. ChargeAfter USA, Inc.*, No. 24 Civ. 746 (RA), 2025 WL

1984273, at *3 (S.D.N.Y. July 17, 2025) (quoting *Kraiem v. JonesTrading

Institutional Servs. LLC*, 492 F. Supp. 3d 184, 195 (S.D.N.Y. 2020)); *see also Trotter

v. Nat'l Football League*, 737 F. Supp. 3d 172, 194 (S.D.N.Y. 2024) (describing the

---

[11] Schaffer alleges no connection with New York State outside of New York City, and thus his
NYSHRL and NYCHRL claims are analyzed jointly for this purpose.

impact requirement as "a substantive limitation on the geographic reach of the respective statutes").[12]

To satisfy the impact requirement, something more than "a tangential connection" to New York State is required. *Hoffman*, 933 N.E.2d at 748. "The 'impact of the discriminatory act' must be felt inside New York State." *Meilus v. Rest. Opportunities Ctr. United, Inc.*, No. 21 Civ. 2554 (CM), 2021 WL 4868557, at *10 (S.D.N.Y. Oct. 15, 2021) (quoting *Hoffman*, 933 N.E.2d at 748). "[I]t is the site of impact, not the place of origination, that determines where discriminatory acts occur." *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 362 (S.D.N.Y. 2007).

Schaffer argues that he meets this test for numerous reasons. (Pl. Br. at 10–15). Schaffer argues that his job involved "constant daily contacts and communications with Defendants' New York City office," where Stueland and many of his peers, subordinates, and other individuals who discriminated against him were located. (Pl. Br. at 11, 13 (emphasis omitted); *see* Compl. ¶¶ 7, 43).

---

[12] Defendants characterize this prong of their motion as raising an issue of "subject matter jurisdiction." (Def. Br. at 16). This framing tracks the language of the New York Court of Appeals in *Hoffman*, 933 N.E.2d at 748, which has been echoed by a number of federal courts that have dismissed NYSHRL and NYCHRL claims for "lack of subject matter jurisdiction" pursuant to Fed. R. Civ. P. 12(b)(1). *E.g.*, *Dittes*, 2025 WL 1984273, at *3–4; *but see Lieberman v. C.A. Goldberg, PLLC*, No. 21 Civ. 5053 (ENV) (JAM), 2025 WL 1607098, at *7 (E.D.N.Y. Apr. 30, 2025) (calling this a "misnomer" when applied to NYSHRL and NYCHRL claims brought in federal court, and instead characterizing the issue as one of justiciability).

Despite asserting that they are moving on subject matter jurisdiction grounds, Defendants bring their motion solely under Rule 12(b)(6). (Def. Br. at 16; Dkt. No. 29). They do not invoke Rule 12(b)(1). This is of no moment to the disposition of the motion, however. Defendants do not ask the Court to consider facts outside of the Complaint. In such a circumstance, the standard of review under Rule 12(b)(1) and under Rule 12(b)(6) is effectively the same. *See Matar v. Dichter*, 500 F. Supp. 2d 284, 287–88 (S.D.N.Y. 2007).

Additionally, Schaeffer argues that he was "regularly required—as a senior leadership team member—to report in person to Defendants' New York City Office," including for quarterly Board meetings, senior leadership team meetings, and other work meetings. (Pl. Br. at 11, 13–14; *see* Compl. ¶¶ 7, 55, 57, 58, 64, 75, 77, 86). Further, Schaffer argues that New York City is where the "key decisions" underlying his claims were made, including the decision to terminate him. (Pl. Br. at 13–14; *see* Compl. ¶¶ 7, 31, 72, 93).

Unfortunately for Schaffer, these connections parallel the facts in *Hoffman*—the case in which the New York Court of Appeals first adopted the impact requirement—and other cases finding the NYSHRL and NYCHRL to be inapplicable under this rule. In *Hoffman*, the Court of Appeals held that the NYCHRL and NYSHRL did not cover a nonresident plaintiff whose employer was headquartered in New York City, who was "managed from" the New York headquarters, who "attended quarterly meetings in New York City," and whose termination decision "was made and executed in New York City." 933 N.E.2d at 745, 748. The court reasoned that, despite these facts, the plaintiff, who lived and worked in Georgia, had not "state[d] a claim that the alleged discriminatory conduct had any impact in either" New York City or New York State. *Id.* at 149. *See Fried v. LVI Servs., Inc.*, 500 F. App'x 39, 42 (2d Cir. 2012) (affirming dismissal of NYCHRL claim despite plaintiff's allegations that he communicated with employer's New York headquarters, that he attended meetings in New York, and

that decision to reassign his work duties was made in New York, and noting that

"*Hoffman* found similar assertions insufficient to satisfy the impact requirement").

Here, like the plaintiff in *Hoffman*, Schaffer lived and worked for GeneDx in

Ohio.  Although Schaffer alleges he worked for Defendants "both" remotely from his

home in Ohio and in Defendants' offices in New York City (Compl. ¶ 41; *see also* Pl.

Br. at 11 (arguing that Schaffer "did work in New York")), he acknowledges that he

was living in Ohio, and his Employment Agreement stated that his "services shall

be performed remotely"—*i.e.*, from Ohio—subject to "regular travel" to Defendants'

offices.  (Agmt. § 1(C)).  Schaffer does not allege that he had an office in New York.

Further, in listing his travel to New York as General Counsel, the Amended

Complaint identifies only nine meetings at GeneDx's New York office (as well as

unspecified "multiple" meetings with Fenwick in New York in the Spring of 2024)

over his nineteen-month tenure—about one visit to New York every two months.

(Compl. ¶ 135).  These allegations show that Schaffer was an Ohio-based employee

and not among those whom the NYCHRL and NYSHRL are meant to protect—

"those who work in the city" (or in New York state).  *Hoffman*, 933 N.E.2d at 747.

Courts applying the *Hoffman* rule "have repeatedly held that a non-resident

plaintiff's occasional meetings in or travel to the city are tangential and do not

satisfy the impact requirement."  *Shiber v. Centerview Partners LLC*, No. 21 Civ.

3649 (ER), 2022 WL 1173433, at *3 (S.D.N.Y. Apr. 20, 2022); *see also, e.g., Pedroza

v. Ralph Lauren Corp.*, No. 19 Civ. 8639 (ER), 2020 WL 4273988, at *3 (S.D.N.Y.

July 24, 2020) (barring NYCHRL claim for nonresident plaintiff who "traveled to

New York City twelve times in the last six months of her employment"). Further, "simply . . . pointing to frequent communication with a managing office in New York City and meetings there regarding local projects" is likewise insufficient to meet the impact requirement. *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 865 (S.D.N.Y. 2013).

Similarly, courts have consistently held that allegedly discriminatory acts committed in New York, including termination of the plaintiff's employment, do not show the requisite impact in New York if the plaintiff, like Schaffer here, lived and worked outside the state. *See, e.g.*, *Mwangi v. Passbase, Inc.*, No. 21 Civ. 6728 (ER), 2022 WL 2133734, at *8 (S.D.N.Y. June 14, 2022) (dismissing plaintiff's NYCHRL and NYSHRL claims because "even if the [discriminatory] acts themselves occurred in New York, their impact was not felt in New York, because [plaintiff] was at all times in Berlin"). Although Schaffer alleges that his termination "took place at" Defendants' offices in New York City, he does not allege he was present in New York at the time; rather he alleges he was terminated "over Zoom." (*See* Compl. ¶ 28). That is not enough. *See, e.g.*, *Smith v. Vera Inst. of Just., Inc.*, No. 21 Civ. 6430 (DG) (CLP), 2023 WL 11879682, at *13 (E.D.N.Y. Aug. 11, 2023) (dismissing claim where plaintiff was terminated by email while working from home in Maryland).

Emphasizing that his job duties as General Counsel were "heavily involved with" New York City, Schaffer contends that the "factual nexus of this case . . . is based primarily around" New York. (Pl. Br. at 11, 15). No doubt factual distinctions can be drawn between this case and cases like (for instance) *Hoffman*,

51

where the plaintiff oversaw accounts located in southern and southwestern states and "did not service any accounts in New York." *Hoffman*, 933 N.E.2d at 745. Inherent in the job of a General Counsel, and a specified duty under Schaffer's Employment Agreement, is to "[s]erve as a trusted advisor" to the company's CEO and other senior leaders. (Agmt. Ex. A). In GeneDx's case, the CEO and CFO allegedly were based in New York, which is also where most Board meetings were held. (Compl. ¶¶ 42–43).

In adopting the impact requirement in *Hoffman*, however, the Court of Appeals stressed the benefits of having a bright-line rule, one which "is relatively simple for courts to apply and litigants to follow, leads to predictable results, and confines the protections of the NYCHRL to those who are meant to be protected." 933 N.E.2d at 747. "This goal would be completely undermined if courts were required to conduct a fact-intensive analysis of the amount of contact a particular individual maintained with New York City" even where it is clear the individual did not work in New York. *Fried v. LVI Servs., Inc.*, No. 10 Civ. 9308 (JSR), 2011 WL 4633985, at *13 (S.D.N.Y. Oct. 4, 2011), *aff'd*, 500 F. App'x 39 (2d Cir. 2012). Unless Schaffer can adequately allege that the *impact* of GeneDx's discriminatory actions was felt in New York, the degree of factual nexus between his job duties and New York does not give him the ability to invoke the NYCHRL or NYSHRL.

Seemingly recognizing as much, Schaffer advances policy reasons as to why the *Hoffman* rule should be relaxed or dispensed with in circumstances like his. He contends that "[t]he legal landscape is changing when it comes to remote employees

52

and jurisdiction" and that employers should not be allowed to skirt applicable laws "by choosing to employ remote workers around the country." (Pl. Br. at 11, 17–18). He relies on the dissenting opinion in *Hoffman* (*id.* at 12–13 (citing *Hoffman*, 933 N.E.2d at 748–49 (Jones, J., dissenting)), and cites a pre-*Hoffman* decision—which the Court of Appeals specifically rejected in *Hoffman*—for the proposition that "'the argument that the NYSHRL applies only when a plaintiff suffers harm within New York is both inconsistent with the clear language of the statute and grounded in unsteady legal precedent.'" (*Id.* at 13 (quoting *Rohn Padmore, Inc. v. LC Play Inc.*, 679 F. Supp. 2d 454, 465 (S.D.N.Y. 2010))); *see Hoffman*, 933 N.E.2d at 746.

But, in light of "the clear directive of *Hoffman*," courts have rejected similar attempts to modify the impact rule to take into account "the increase in remote working arrangements" since the Court of Appeals's decision. *Pakniat v. Moore*, 192 A.D.3d 596, 145 N.Y.S.3d 30, 31 (1st Dep't 2021); *see also Shiber*, 2022 WL 1173433, at *5–6 (rejecting policy arguments similar to those made by Schaffer here and relying on *Pakniat*); *Smith*, 2023 WL 11879682, at *13 ("Remote interactions while the plaintiff is not in New York are certainly insufficient to satisfy the impact analysis."). This Court, no less than the First Department in *Pakniat*, is bound by the Court of Appeals's clear holding in *Hoffman*. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 48 (2d Cir. 2013) ("[Federal courts] are bound, of course, by the law of New York as interpreted by the New York Court of Appeals.").

Accordingly, the decision or action to terminate Schaffer, or any other discriminatory action taken while Schaffer was working from Ohio or elsewhere,

cannot confer jurisdiction under the NYCHRL or NYSHRL.  However, "[t]o the degree incidents of [discrimination] occurred while [plaintiff] was in New York City," courts recognize that such claims can support a finding of jurisdiction. *Kraiem*, 492 F. Supp. 3d at 200.  This can be true even where an employee spends the bulk of their time outside New York.  *See, e.g.*, *Desiderio v. Hudson Techs., Inc.*, No. 22 Civ. 541 (ER), 2023 WL 185497, at *5 (S.D.N.Y. 2023) (plaintiff living in Florida who "worked remotely during the COVID-19 pandemic" pled viable claim where she alleged that during a meeting in Queens, she endured "harsh treatment at the hands of [defendant's President and CEO], which she describe[d] as motivated by gender discrimination").

Schaffer's opposition brief, however, does not point to any specific discriminatory acts perpetrated against him while he was in New York that could support a claim under the NYCHRL or NYSHRL even if the bulk of his claims under those laws are dismissed under the impact test.  Rather, he argues that his NYCHRL and NYSHRL claims should survive in their entirety because his employment was allegedly centered in New York and the alleged wrongdoers were based there.  (*See* Pl. Br. at 10–18).  While his brief lists various meetings he attended in New York, neither his descriptions of those meetings nor the cited paragraphs from the Amended Complaint allege that he was impacted by discriminatory actions during those meetings.  (*See id.* at 13–14).

The closest the Amended Complaint comes to alleging an instance of discrimination while Schaffer was in New York concerns the comments Stueland

54

made during meetings in New York bragging about GeneDx's high rate of female employees and complaining about male CEOs. (Compl. ¶¶ 30, 77). But Schaffer does not allege that these comments were directed at him. Rather, he alleges that the comments were made at Board meetings, meetings with other executives, and a Senior Leadership Team offsite with the entire management team present, and that he merely "witnessed" these comments in person. (*Id.* ¶ 30). Schaffer does not allege that these remarks had any impact on him and relies on them as evidence of Stueland's favoritism towards White females rather than as a discriminatory act taken against him. (*See* Compl. ¶¶ 1, 134.a). Thus, Schaffer has not plausibly alleged that Stueland's comments, or anything else that happened in New York, evinces a sufficiently meaningful impact on him in New York as to justify jurisdiction under the NYCHRL or NYSHRL over any portion of his claim.

Accordingly, the undersigned recommends that Schaffer's NYCHRL and NYSHRL claims be dismissed.

### b. CFEPA

GeneDx also argues that Schaffer cannot claim protection under the CFEPA for the same reason, namely, that the impact of the alleged discrimination did not occur in Connecticut. (Def. Br. at 16, 17; Def. Reply at 7). Schaffer responds by arguing that GeneDx's corporate headquarters are in Stamford, Connecticut, that the Agreement required him to travel to Stamford, that he attended and spoke at an annual shareholders' meeting in Stamford in June 2024, and that he meets the

55

definition of an "employee" under the CFEPA because GeneDx paid his wages.  (Pl. Br. at 16–17).

Neither party offers any analysis of the jurisdictional or geographic reach of the CFEPA or cites any cases addressing that question.  GeneDx simply assumes that the CFEPA is subject to the same limiting construction that the New York Court of Appeals placed on the NYSHRL and the NYCHRL in *Hoffman.*  GeneDx provides no support for that assertion, however, nor has the Court found in Connecticut case law any citation to *Hoffman* or reference to an impact requirement.  Moreover, the language in the NYCHRL and NYSHRL emphasizing that their protections are meant for "inhabitants" and those "in" or within New York city or state, which played a key role in the *Hoffman* court's analysis, *see* 933 N.E.2d at 746–47, is absent from the CFEPA.[13]  Therefore, the Court will not simply assume that the *Hoffman* test is controlling under the CFEPA.

At the same time, the Court cannot accept Schaffer's argument that he is protected by the CFEPA simply because he was a GeneDx employee.  In the Amended Complaint, Schaffer does not allege either that he worked in Connecticut or that any of Defendants' discriminatory acts occurred in Connecticut.  And while he alleges he attended one shareholders' meeting in Connecticut, he does not allege

---

[13] The language of the CFEPA does not appear to contain similar clues as to its geographic reach. The CFEPA simply provides that it shall be unlawful "[f]or an employer, . . . except in the case of a bona fide occupational qualification or need, . . . to discriminate against any individual" on the basis of, *inter alia*, race or sex.  Conn. Gen. Stat. § 46a-60(b)(1).  The term "[e]mployer" includes "the state and all political subdivisions thereof and means any person or employer with one or more persons in such person's or employer's employ."  *Id.* § 46a-51(10).  The term "[e]mployee" means "any person employed by an employer."  *Id.* § 46a-51(9).

that anything happened at that meeting that is of relevance to his discrimination claims.  Thus, his only real basis for urging application of the CFEPA is that GeneDx's corporate headquarters are formally located in Stamford, even though, based on Schaffer's own allegations, its functional headquarters and principal place of business was in New York City.  (*See* Compl. ¶¶ 7, 24, 28, 31, 33, 41, 43).  Schaffer cites no authority to support his position, and a considerable body of precedent construing other state anti-discrimination laws (including laws worded similarly to the CFEPA) refutes it.[14]

Ultimately, it is unnecessary for the Court to predict whether the Connecticut Supreme Court would follow the *Hoffman* rule or to otherwise opine on the geographic reach of the CFEPA.  The parties agree, and case law confirms, that the CFEPA's anti-discrimination protections are co-extensive with those of Title VII.  (Def. Br. at 18; Pl. Br. at 18; *Gray v. Minn. Mining & Mfg. Co.*, 732 F. Supp. 3d 184, 190 (D. Conn. 2024) (noting that "[t]he intent of the Connecticut legislature in adopting the CFEPA was to make the statute coextensive with Title VII") (citation omitted)).  Thus, for Rule 12(b)(6) purposes, Schaffer has either stated a claim under both Title VII and CFEPA, or he has stated a claim under neither.  At this

---

[14] Numerous courts have held that "the location of the corporate headquarters or principal place of business is irrelevant in determining whether state anti-discrimination statutes apply to nonresident plaintiffs" who neither live nor work in the state. *Blackman v. Lincoln Nat'l Corp.*, Civil Action No. 10-6946, 2012 WL 6151732, at *6 (E.D. Pa. Dec. 10, 2012) (citing cases construing the Iowa, Kentucky, Minnesota, Maine, and New Jersey anti-discrimination statutes, and adopting the same approach under the Pennsylvania statute).  Some state statutes have been held to apply where alleged discriminatory acts took place at the defendant-corporation's headquarters within the state, even if the plaintiff-employee neither lived nor worked in the state. *See, e.g., Border v. Nat'l Real Estate Advs., LLC*, 453 F. Supp. 3d 249, 254 (D.D.C. 2020); *Chan v. Wellington Mgmt. Co.*, 424 F. Supp. 3d 148, 151 (D. Mass. 2019).  But, as noted, Schaffer does not allege that any discriminatory acts took place in Connecticut.

juncture of the case, nothing of substance turns on whether Schaffer's claims are deemed to fall within the jurisdictional scope of the CFEPA.  Under these circumstances, and in the absence of any meaningful briefing from the parties, the Court refrains from deciding that question at this time.

### 2.  Sufficiency of Plaintiff's Discrimination Claims

In his discrimination claims brought under Title VII, § 1981, and the CFEPA, Schaffer primarily alleges that he was subjected to adverse employment actions, *i.e.*, he was denied compensation and benefits and then was unlawfully terminated, on account of his race.  (Compl. ¶¶ 133, 142, 165, 171–87, 195).  In his sex discrimination claim under the Title VII, Schaffer also alleges that he was subjected to a hostile work environment based on his sex.  (*Id.* ¶ 172).  The Court analyzes these two theories of liability separately.

### a.  Discriminatory Treatment

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To state a claim for employment discrimination under Title VII, "a plaintiff must allege facts that give rise to a plausible inference that (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination."  *Pell v. Yonkers City Sch. Dist.*, No. 23 Civ. 10398 (NSR), 2025 WL 2084739, at *5 (S.D.N.Y. July 24,

2025).  The pleading standards for discrimination claims brought under 42 U.S.C. § 1981 and the CFEPA are the same as those for Title VII claims.  *See Moore v. Hadestown Broadway Ltd. Liab. Co.*, 722 F. Supp. 3d 229, 245 (S.D.N.Y. 2024); *Cloutier v. Ledyard Bd. of Educ.*, 575 F. Supp. 3d 276, 282 n.7 (D. Conn. 2021).

Claims of discrimination under Title VII, § 1981, and the CFEPA ultimately "are governed by the three-step burden shifting analysis" announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Sanchez v. Conn. Nat. Gas Co.*, 421 F. App'x 33, 34 (2d Cir. 2011).  "'Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination.'"  *Mejia v. White Plains Self Storage Corp.*, No. 18 Civ. 12189 (KMK), 2020 WL 247995, at *4 (S.D.N.Y. Jan. 16, 2020) (quoting *Abrams v. Dep't of Public Safety*, 764 F.3d 244, 251 (2d Cir. 2014)).  Discrimination may be proven "either by direct evidence of intent to discriminate or, more commonly, by indirectly showing circumstances giving rise to an inference of discrimination."  *Bart v. Golub Corp.*, 96 F.4th 566, 569 (2d Cir. 2024) (citation omitted).

The Supreme Court has clarified that establishing a prima facie case under *McDonnell Douglas* is "an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002).  Accordingly, a plaintiff "is not required to plead a prima facie case under *McDonnell Douglas*, at least as the

test was originally formulated, to defeat a motion to dismiss." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015).  "Rather, because 'a temporary "presumption" of discriminatory motivation' is created under the first prong of the *McDonnell Douglas* analysis, a plaintiff 'need only give plausible support to a minimal inference of discriminatory motivation'" at the pleading stage.  *Id.* (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 307, 311 (2d Cir. 2015)); *see also Salu v. Miranda*, 830 F. App'x 341, 345 (2d Cir. 2020).  This is a "low bar," *Lewis v. Roosevelt Island Oper. Corp.*, 246 F. Supp. 3d 979, 989 (S.D.N.Y. 2017), and the Second Circuit has repeatedly "cautioned district courts against imposing too high a burden on plaintiffs alleging discrimination at the 12(b)(6) stage." *Doe v. Columbia Univ.*, 831 F.3d 46, 55 n.8 (2d Cir. 2016).

It is undisputed on this motion that Schaffer has alleged facts sufficient to satisfy the first three requirements for stating a discrimination claim: (1) that, as a Black male, he was a member of protected classes based on his race and sex; (2) that he was qualified for the position of General Counsel; and (3) that he suffered adverse employment actions.[15]  GeneDx challenges only whether Schaffer has satisfied the fourth requirement by sufficiently alleging circumstances giving rise to

---

[15] Of course, termination of employment "is the quintessential materially adverse employment action under Title VII." *Taylor v. Seamen's Soc'y for Children*, No. 12 Civ. 3713 (PAE), 2013 WL 6633166, at *12 (S.D.N.Y. Dec. 17, 2023).  The denial of Schaffer's request for a sign-on bonus, and the reduction in his stock award, could also qualify as adverse employment actions under Title VII.  *See, e.g.*, *Reynolds v. Goshen Med. Cent. Inc.*, No. 7:24-CV-1081-M-BM, 2025 WL 2490458, at *12 (E.D.N.C. July 28, 2025) (failure to award sign-on bonus was an adverse employment action), *R&R adopted*, 2025 WL 2487782 (E.D.N.C. Aug. 28, 2025); *Ifill v. United Parcel Serv.*, No. 04 Civ. 5963 (LTS) (DFE), 2008 WL 2796599, at *5 (S.D.N.Y. July 17, 2008) (stock award reduction was adverse employment action).  Defendants do not, on this motion, make any arguments as to whether Schaffer has properly alleged adverse employment actions.

an inference of discrimination. (*See* Def. Br. at 17–22).[16]  In addition, GeneDx argues that Schaffer's allegations establish that he was terminated for legitimate reasons (*id.* at 22–23) and that his discrimination claims are barred by the "same-actor inference" (*id.* at 23).  The Court considers these three arguments in turn.

### i.  Inference of Discrimination

An "inference of discrimination" can arise, *inter alia*, "from 'the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge' or 'when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class.'"  *Murray v. Brag Sales Inc.*, No. 23 Civ. 6610 (JPO), 2024 WL 3952649, at *4 (S.D.N.Y. Aug. 27, 2024) (quoting *Littlejohn*, 795 F.3d at 312–13).[17]  Conclusory allegations of discriminatory intent are insufficient.  *Rose v. Goldman, Sachs & Co.*, 163 F. Supp. 2d 238, 242 (S.D.N.Y. 2001).  A plaintiff must "plead specific facts that support a minimal plausible inference of discrimination."  *Doe*, 831 F.3d at 56; *see also Mumin v. City of New York*, 760 F. Supp. 3d 28, 51 (S.D.N.Y. 2024) ("'[T]o survive a motion to dismiss, a plaintiff must support her claims with specific and detailed factual allegations, not stated in wholly conclusory terms.'"

---

[16] GeneDx also argues that Schaffer has not alleged direct evidence of discrimination. (Def. Br. at 19–20).  Schaffer appears to concede the point. (*See* Pl. Br. at 19–20).  However, even "'absent direct evidence of discrimination,'" a plaintiff may satisfy the fourth prong by plausibly alleging circumstances giving rise to an inference of discrimination.  *Buon v. Spindler*, 65 F.4th 64, 79 (2d Cir. 2023) (quoting *Littlejohn*, 795 F.3d at 311).

[17] An inference of discrimination can also arise from "the employer's criticism of the plaintiff's performance in . . . terms [that are degrading to the employee's protected group]" or "invidious comments about others in the employee's protected group."  *Littlejohn*, 795 F.3d at 312.  The complaint does not contain allegations of this nature.

(quoting *Williams v. N.Y.C. Health & Hosp. Corp.*, No. 08 Civ. 4123 (RRM), 2010 WL 2836356, at *4 (S.D.N.Y. July 16, 2010))) (cleaned up).

The Amended Complaint contains several specific factual allegations of disparate treatment. Schaffer alleges that while his request for a $100,000 sign-on bonus was denied, Duquette, the incoming Chief Operating Officer, a White female, was paid a sign-on bonus significantly above what he asked for. (Compl. ¶¶ 31, 134.a). Schaffer also alleges that after the Compensation Committee decided on stock awards to top executives on an equitable basis, Stueland told him that his award alone would be cut in half, with the difference going instead to the same White female executive, Duquette. (*Id.* ¶¶ 68, 72, 134.a). In addition, Schaffer alleges that Stueland diminished his role as General Counsel and instead favored White partners at Fenwick. Stueland did this by, *inter alia*, consulting on strategic matters with Fenwick rather than with Schaffer, insisting on Fenwick's sitting in on her monthly meetings with Legal, and having Fenwick monitor Schaffer's work. (*Id.* ¶¶ 53, 54, 73, 134.b, c, e, h). Schaffer alleges that he was the only one of Stueland's direct reports who received such oversight. (*Id.* ¶ 53).

Such non-conclusory allegations of disparate treatment normally suffice to plausibly plead the minimal support for an inference of discrimination necessary at the pleading state. *See, e.g., Cherner v. CF Bankshares Inc.*, No. 24 Civ. 2812 (PMH), 2025 WL 1745864, at *8 (S.D.N.Y. June 23, 2025) (plaintiff sufficiently pled inference of discrimination by alleging, *inter alia*, that he was treated less favorably than a less-qualified female employee and that female supervisor told other female

employees that they did not have to respond to him and could ignore his requests for information); *Johnson v. Long Island Univ.*, 58 F. Supp. 3d 211, 224 (E.D.N.Y. 2014) (plaintiff sufficiently pled inference of discrimination by alleging that defendant denied him the opportunity to earn additional compensation, while other similarly situated employees outside his class were given that opportunity, and by assigning him more work than other employees); *Drew v. Plaza Const. Corp.*, 688 F. Supp. 2d 270, 281 (S.D.N.Y. 2010) (plaintiff sufficiently pled inference of discrimination by alleging that he was "subjected to unusually harsh treatment that his Caucasian coworkers were not," as well as that defendants could give no examples of insubordination for which he was terminated and that he was ultimately replaced by a member of an unprotected class).

The sequence of events leading to Schaffer's discharge also lends some support to an inference of discrimination. Schaffer alleges that he was terminated after only 16 months in his position, without any prior warning, after performing his duties properly and in exemplary fashion, and receiving generally positive feedback. (Compl. ¶¶ 58, 62, 63, 70, 90, 93, 121, 142). Schaffer claims he received no coherent explanation for why he was being fired and that the reasons he was given were false and pretextual. (*Id.* ¶¶ 93, 120). These allegations support an inference of discrimination. *See, e.g.*, *Weiss v. JPMorgan Chase & Co.*, 332 F. App'x 659, 662 (2d Cir. 2009) (evidence that plaintiff's termination occurred under "abrupt and unusual circumstances suggested discrimination"); *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) (inference of discrimination found where

63

"questions and inconsistencies abound as to the reason for [plaintiff's] discharge"); *Cherner*, 2025 WL 1745864, at *8 (relying on plaintiff's allegation that HR manager "was unable to provide any additional information as to the reason for his termination" beyond the "bank was going in a different direction"); *Strohmeyer v. Int'l Broth. of Painters & Allied Trades*, 989 F. Supp. 455, 459 (W.D.N.Y. 1997) (inference of discrimination justified in age discrimination case where plaintiff was "terminated, without warning, and then replaced by a considerably younger individual").

Finally, Schaffer alleges that, after Stueland fired him, she replaced him with an individual outside his protected class who is female and not Black.  (Compl. ¶ 98).[18]  Ordinarily, the fact that a plaintiff was replaced with someone outside the protected class will "suffice for the required inference of discrimination at the initial prima facie stage of the . . . analysis, including at the pleading stage." *Littlejohn*, 795 F.3d at 313; *see, e.g.*, *Clawson v. City of Albany Dep't of Fire & Emergency*, No. 23-482, 2024 WL 1044531, at *2 (2d Cir. Mar. 11, 2024) (Black plaintiff's allegation that he was replaced by Caucasian employee was sufficient to raise inference of discrimination); *Richmond v. Sorenson*, No. 22 Civ. 10075 (VB), 2023 WL 4239083, at *3 (S.D.N.Y. June 28, 2023) (plaintiff satisfied her burden of pleading facts giving rise to an inference of discrimination by alleging she was replaced by a man after being stripped of her position by a man); *Shortt v. Congregation KTI*, No. 10 Civ. 2237 (ER), 2013 WL 142010, at *9 (S.D.N.Y. Jan. 9, 2013) ("For claims brought

---

[18] Although Schaffer does not specifically allege the race of the individual who replaced him, the Court will assume she is not Black, as inferences must be drawn in Plaintiff's favor on this motion.

under Title VII, in order to raise an inference of discrimination at the *prima facie* stage, it is typically sufficient for a plaintiff to show that the position was filled by someone outside of his protected class.").

In challenging the sufficiency of the Amended Complaint's discrimination allegations, GeneDx primarily argues that Schaffer "fails to plead facts showing that he was treated less favorably than similarly situated individuals outside his protected class with similar experience, responsibilities, or performance who engaged in comparable conduct." (Def. Br. at 3). GeneDx contends that Schaffer therefore has not pleaded facts demonstrating that he and those outside his protected class who allegedly received more favorable treatment were similarly situated "in all material respects," and, as a result, has failed to plead an inference of discrimination. (*Id.* at 20–22). The Court finds this argument unpersuasive.

"To establish an inference of discrimination, a plaintiff must allege that '[he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [him]self.'" *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). "What will constitute 'all material respects' will vary from case to case[.]" *Id.*; *see Anderson v. N.Y.C. Dep't of Finance*, No. 19 Civ. 7971 (RA), 2021 WL 168476, at *2 (S.D.N.Y. Jan. 19, 2021) ("Whether a plaintiff and his comparators are similarly situated in all material respects is a context specific analysis that will vary from case to case."). "The plaintiff's and comparator's circumstances must bear a 'reasonably close

resemblance,' but need not be 'identical.'" *Brown*, 756 F.3d at 230 (quoting *Graham*, 230 F.3d at 40).

"Ordinarily, '[w]hether two employees are similarly situated . . . presents a question of fact,' rather than a legal question to be resolved on a motion to dismiss." *Brown*, 756 F.3d at 230 (quoting *Graham*, 230 F.3d at 39). "Indeed, 'it is precisely in light of the inquiry's fact-intensive nature that [the Second Circuit] caution[s] against deciding whether . . . comparators are similarly situated on a motion to dismiss.'" *Sampson v. Int'l Union of Operating Eng'rs Loc. 14-14B*, No. 22 Civ. 3588 (DG) (RER), 2023 WL 8530116, at *5 (E.D.N.Y. July 10, 2023) (quoting *Hu v. City of New York*, 927 F.3d 81, 97 (2d Cir. 2019)). Even at the motion to dismiss stage, however, "a court still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated." *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 698 (S.D.N.Y. 2011).

Here, Schaffer's principal comparator for purposes of his disparate treatment allegations is Duquette, who was GeneDx's Chief Commercial Officer. Schaffer alleges that Duquette, like him, was a member of GeneDx's Executive Leadership Team who (it may be reasonably inferred from his allegations) reported directly to Stueland. (Compl. ¶ 31; *see id.* ¶¶ 69, 72, 81). Moreover, he alleges that he and Duquette were treated differently with respect to matters concerning their status as senior executives, *i.e.*, the receipt (or in Schaffer's case, non-receipt) of a sign-on bonus (*id.* ¶ 31) and stock awards made to members of the Executive Leadership

66

Team (*id.* ¶ 72).  These allegations are sufficient, at the pleading stage, to raise a plausible inference that Plaintiff and Duquette were similarly situated in all "material respects," *i.e.*, in the respects most logically relevant to the decisions as to which Schaffer alleges discriminatory treatment.  *See, e.g., McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) (emphasizing that the "similarly situated" analysis looks to whether the distinctions between the plaintiff and the comparator have "logical relevance to the plaintiff's claims"); *O'Toole as Trustee of Estate of Fratto v. County of Orange*, No. 16 Civ. 2059 (NSR), 2019 WL 1099721, at *7–8 (S.D.N.Y. Mar. 18, 2019) (explaining that Second Circuit precedent focuses on "whether the constants between the employees were enough to test the variable, not whether the employees were formalistically similar on every axis").

GeneDx faults Schaffer for not pleading Duquette's specific "job responsibilities, duties, years of experience [or] qualifications," whether he and she were subject to "the same standards governing performance, evaluation and discipline," and "any facts regarding Ms. Duquette's performance."  (Def. Br. at 21).  But GeneDx fails to explain why, in the context of Schaffer's claims of disparate treatment, such details are logically necessary for there to be a plausible inference that Schaffer and Duquette were similarly situated.  And its argument contradicts precedent in this Circuit making clear that similarities as to such characteristics need not always be pleaded, or proven, in order to show *material* similarity.

In *McGuiness*, for example, the plaintiff claimed disparate treatment based on her severance package as compared to a more favorable package given to a male

employee, "who like plaintiff was an executive-level employee." 263 F.3d at 53. The district court had dismissed the claim on summary judgment, reasoning that employees could not be similarly situated unless the comparator "had the same supervisor, worked under the same standards, and engaged in the same conduct." *Id.* The Second Circuit, however, reversed that ruling as a "misreading" of its precedent. *Id.* The court found that plaintiff had raised an inference of discrimination by establishing that she and the male employee "held positions of roughly equivalent rank (both in the Executive Cabinet), that [they] were fired at roughly the same time, [and] that the decisions with respect to the severance were both made at the highest levels of the company." *Id.* at 54. By contrast, the differences upon which the district court relied were "not so significant as a matter of logic as to render defendant's disparate treatment of [the male employee] irrelevant to plaintiff's claims of discrimination." *Id.*

More recently, the Second Circuit found that a Title VII plaintiff plausibly alleged that she and various male department heads, who were treated more favorably than her despite allegedly engaging in the same conduct (complaining about the CEO's conduct during the COVID-19 pandemic), were similarly situated in that they "all report[ed] to the CEO." *Back v. Hapoalim*, No. 24-1064-cv, 2024 WL 4746263, at *4 (2d Cir. Nov. 12, 2024) (summary order). In so doing, the court reversed the district court's ruling, which, focusing on the same characteristics highlighted by GeneDx here, had found that differences in "job responsibilities, business unit, performance, [and] length of experience" precluded the plaintiff from

68

adequately alleging that she and the male department heads were similarly situated. *Back v. Bank Hapoalim, B.M.*, No. 23 Civ. 2040 (ER), 2024 WL 1216659, at *8 (S.D.N.Y. Mar. 21, 2024). The Second Circuit emphasized that these questions regarding whether plaintiff's and her alleged male comparators' "positions, responsibilities, and chains of command" were sufficiently similar "are fact-intensive ones that are not appropriately resolved in this case, as a matter of law, on a motion to dismiss." *Back*, 2024 WL 4746263 at *4.

Numerous district courts in this Circuit have likewise declined to require that similarity be pled with the level of specificity that GeneDx insists on here. *See, e.g.*, *Wilson Yonkers Pub. Schools*, No. 24 Civ. 184 (PMH), 2025 WL 2689081, at *7 (S.D.N.Y. Sept. 19, 2025) (where plaintiff identified similarly situated employees by name and position and alleged they were in his department, "[s]uch allegations, in this posture, suffice to plead a plausible inference of discrimination based on disparate treatment"); *Naula v. N.Y.C. Dep't of Educ.*, No. 24 Civ. 333 (NRM) (LB), 2025 WL 948100, at *5 (E.D.N.Y. Mar. 30, 2025) (finding that plaintiff and proposed comparator were "materially similarly situated" because they both had "a responsibility to report bullying incidents"—the key consideration underlying her claim of disparate treatment—and that "[t]he question of their specific duties and responsibilities is a fact-intensive one that is not appropriate to address at the pleading stage"); *Johnson*, 58 F. Supp. 3d at 224 (finding plausible inference of discrimination based on disparate treatment even though "the Complaint is sparse on specifics with respect to how [plaintiff's] colleagues are similarly situated to

him"); *Trachtenberg v. Dep't of Educ. of City of New York*, 937 F. Supp. 2d 460, 471 (S.D.N.Y. 2013) (although plaintiff's "allegations are thin on specifics—both as to how each comparator is similarly situated to [plaintiff] and what disparate treatment he or she was subjected to, . . . the Court finds that [he] has . . . pled sufficient facts to give rise to a plausible inference of discrimination based on disparate treatment").

These same principles doom GeneDx's additional argument that Schaffer is not similarly situated to Duquette and other members of the Executive Leadership Team to whom he compares himself because Schaffer "was in a legal role" whereas Duquette was "in a commercial role" and Feeley (for example) had "corporate finance responsibilities." (Def. Br. 22). Here again, GeneDx's argument myopically ignores the broader point: Schaffer and other members of the Executive Leadership Team were similarly situated *as* senior executives reporting to Stueland, which is the job characteristic most salient to Schaffer's claims of disparate treatment. Those allegations are sufficient at this stage. *See Back*, 2024 WL 4746263, at *4 (plaintiff and comparators "all report[ed] to the CEO"); *McGuinness*, 263 F.3d at 53–54 (plaintiff and comparators "held positions of roughly equivalent rank (both in the Executive Cabinet)").[19]

In any event, even if Defendants' challenge to Schaffer's allegations of disparate treatment had more merit than the Court perceives in it, those

---

[19] Defendants also argue that Schaffer improperly relies on Skerry, the Fenwick partner, as a comparator. (Def. Br. at 22). It does not appear that Schaffer makes such a claim (*see* Pl. Br. at 20–21), and so there is no need for the Court to address the issue.

allegations are not—contrary to the premise underlying Defendants' challenge—the only circumstances alleged here supporting "a minimal inference of discriminatory motivation," *see Littlejohn*, 795 F.3d at 309.  Rather, as discussed above, the Amended Complaint also pleads facts concerning the events leading to Schaffer's termination that support an inference of discrimination, *and* pleads that Schaffer was replaced by a person outside his protected class—an allegation that typically is sufficient by itself to meet the plaintiff's pleading burden.  "A showing of disparate treatment is only one method of raising an inference of discrimination and a plaintiff also may create a '"mosaic" of intentional discrimination by identifying "bits and pieces of evidence" that together give rise to an inference of discrimination.'" *Stinnett v. Delta Air Lines, Inc.*, 278 F. Supp. 3d 599, 611–12 (E.D.N.Y. 2017) (quoting *Vega*, 801 F.3d at 87) (cleaned up).

Considering all of Plaintiff's allegations together, and recognizing they may be "thin," such allegations, at the very least, "constitute 'bits and pieces of evidence' that together create a 'mosaic' sufficient to clear the low pleading threshold and constitute an inference of discrimination." *Cherner*, 2025 WL 1745864, at *8 (citation omitted).  That is all that is required at this stage of the litigation. Accordingly, the Court finds that Schaffer has pled sufficient facts to provide the requisite minimal support for an inference of race-based and sex-based discrimination needed to survive Defendants' motion to dismiss.

### ii. Legitimate Reasons for Termination

GeneDx next argues that "Plaintiff's own allegations establish that he was terminated for legitimate reasons" (Def. Br. at 22), referring to the second step of the *McDonnell Douglas* analysis.  This argument is a non-starter.  "Whether there existed non-pretextual, non-discriminatory explanations for the defendants' employment decisions—a question as to which the defendants bear the burden of production, *see McDonnell Douglas,* 411 U.S. at 802–03—is not properly decided on a motion to dismiss for failure to state a claim."  *Brown*, 756 F.3d at 230–31.

Further, GeneDx's effort to portray the Amended Complaint as "acknowledg[ing]" that there were "legitimate, nondiscriminatory reasons that led to [Schaffer's] termination" (Def. Br. at 23) distorts Schaffer's actual allegations.  Although the complaint describes Stueland's *stated* reasons for why Schaffer was being terminated—*i.e.*, that he and Schaffer were not in "lock-step" and that Schaffer had performance "misses" (Compl. ¶ 93)—Schaffer's pleading in no way "acknowledges" the truth of Stueland's assertions.  To the contrary, the complaint specifically alleges that the "excuses given for Plaintiff's termination" were "false and pretextual."  (*Id.* ¶ 120).  And the complaint also alleges, in substance, that the one incident cited by Stueland as a performance "miss" never happened.  (*Id.* ¶ 93).

Accordingly, GeneDx's argument must be rejected.  *See Feliciano v. City of New York*, No. 14 Civ. 6751 (PAE), 2015 WL 4393163, at *6 (S.D.N.Y. July 15, 2015) ("Defendants also note that the Amended Complaint has pled facts that may be read to support plausible non-discriminatory explanations for [plaintiff's] failure to

be promoted. . . . But on a motion to dismiss, where a prima facie case has been pled, the Court cannot find as matter of fact that a defendant's motives were non-discriminatory so as to defeat that inference.").

### iii. Same Actor Inference

For similar reasons, GeneDx's argument that the "same actor inference" vitiates Schaffer's discrimination claims is simply premature.  (Def. Br. at 23). GeneDx argues that because Stueland hired Schaffer, knowing that he is a Black male, and then terminated his employment 16 months later herself, this negates an inference that his termination was based on an invidious discriminatory motivation. (*Id.*).  As GeneDx points out, Schaffer's brief does not specifically address this argument.  (Def. Reply at 9–10; *see* Pl. Br. at 18–22).  Nonetheless, GeneDx is incorrect as a matter of law.

The same actor inference posits that "where the same actor hires and fires an employee in a short time period, courts may draw an inference that the firing was not with discriminatory intent." *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 329 (S.D.N.Y. 2020).  The Second Circuit has not determined whether the inference, which it has "applied in the context of age discrimination claims under the ADEA, should also apply to claims under Title VII." *Buon*, 65 F.4th at 84.

But even assuming that the same actor inference did apply to such claims, the Second Circuit made clear in *Buon* that its potential relevance comes into play "at the summary judgment stage, when the burden-shifting framework associated with *McDonnell Douglas* applies." *Id.* at 85.  The same actor inference is "not

73

similarly relevant at the motion-to-dismiss stage, when we are primarily concerned with whether there is minimal support for the proposition that the employer was motivated by discriminatory intent, and not with questions as to which the defendants bear the burden of production, such as whether there existed non-pretextual, nondiscriminatory explanations for the defendants' employment decisions." *Id.* (internal quotations and citations omitted). As a result, reversing a district court decision that had relied on the same actor inference in dismissing a complaint, the Second Circuit squarely held that "the inference should not be used to foreclose Title VII and Section 1983 claims at the motion-to-dismiss stage if the plaintiff has otherwise set forth allegations that support a plausible inference of discrimination." *Id.*

Accordingly, as Schaffer has set forth allegations that support a plausible inference of discrimination, Schaffer's discrimination claims cannot be dismissed, on this motion, based on the same-actor inference. *See Hill v. Soar Restaurants II LLC*, No. 23 Civ. 396 (GTS) (TWD), 2024 WL 1257415, at *6 (N.D.N.Y. Mar. 25, 2024) (concluding that, after *Buon*, "any potential application of the same-actor inference is not relevant at th[e] [motion to dismiss] stage.").

### b. Hostile Work Environment

"To plausibly state a hostile work environment claim under Title VII, a plaintiff must plead that the complained of conduct (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively

perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's protected characteristic." *Nanakumo v. N.Y.C. Health & Hosps. Corp.*, No. 23 Civ. 314 (ALC), 2025 WL 919479, at *7 (S.D.N.Y. Mar. 26, 2025) (internal quotations omitted); *see also Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015); *Molina v. John Jay Inst. for Justice & Opportunity/City Univ. of N.Y.*, No. 23 Civ. 1493 (DEH), 2024 WL 4276913, at *8 (S.D.N.Y. Sept. 24, 2024) ("[T]o state a hostile work environment claim under Title VII, a plaintiff must allege facts demonstrating that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" (quoting *Rivera v. Rochester Genesee Regional Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014))).  "The same standards that apply to hostile work environment claims under Title VII also apply to hostile work environment claims under CFEPA or § 1981." *West v. City of Hartford*, 3:20-cv-1210 (KAD), 2022 WL 17850357, at *7 n.7 (D. Conn. Dec. 22, 2022).

As noted, Schaffer's Title VII sex discrimination claim alleges, *inter alia*, that he was "subjected to an intentional hostile work environment because of his sex." (Compl. ¶ 172).  The Court will assume that he also asserts a hostile work environment claim under Title VII based on his race.[20]  However, the Amended Complaint never specifically identifies or articulates what facts Schaffer's hostile

---

[20] Explicit allegations of hostile work environment are not found in Schaffer's race discrimination claims under Title VII, § 1981 or the CFEPA.  However, Schaffer does include hostile work environment allegations in his race discrimination claims under the NYSHRL and NYCHRL. (Compl. ¶¶ 147, 157).

work environment claims are based on.  Nor does Schaffer's opposition brief identify those facts or make any argument as to why his hostile environment claims should survive GeneDx's motion to dismiss—the brief does not discuss Schaffer's hostile work environment claims at all.  While the Court would be justified in viewing Schaffer's hostile work environment claims as abandoned under these circumstances, *see, e.g.*, *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 392 (S.D.N.Y. 2013), the Court has nonetheless reviewed the Amended Complaint's allegations to determine if they state a claim.

Even accepting Schaffer's allegations as true, there is nothing in the Amended Complaint plausibly suggesting that Schaffer's workplace was "permeated with discriminatory intimidation, ridicule, and insult" so "severe or pervasive" as to have altered the conditions of his employment or created an abusive working environment.  *Molina*, 2024 WL 4276913, at *8.  To be sure, the complaint is rife with allegations that, due to her supposed insecurities and erratic management style, Stueland created a "toxic" and "hostile" work environment for Schaffer (and other management team members) at GeneDx.  (*See, e.g.*, Compl. ¶¶ 61, 73, 79, 85, 87–88, 99, 206).  But "a hostile work environment 'is actionable [under Title VII] only when it occurs *because* of an employee's . . . protected characteristic.'"  *Bliss v. MXK Rest. Corp.*, 220 F. Supp. 3d 419, 423 (S.D.N.Y. 2016) (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)) (emphasis added by *Bliss* court); *see also Paupaw-Myrie v. Mt. Vernon City School Dist.*, 653 F. Supp. 3d 80, 106 (S.D.N.Y. 2023) (while workplaces with "abusive bosses, . . . nastiness, or

unfairness" may be "hostile in the colloquial sense, they do not violate the law unless they are that way because of an employee's protected characteristic'" (quoting *Estevez v. Berkeley Coll.*, No. 18 Civ. 10350 (CS), 2021 WL 3115452, at *19 n.21 (S.D.N.Y. July 19, 2021))). Because the complaint does not plead facts plausibly suggesting that the alleged "toxic" or "hostile" environment at GeneDx was due to his race or sex, Schaffer's hostile work environment allegations fail to state a claim under Title VII, § 1981, or the CFEPA.

Schaffer does allege that Stueland made comments suggesting a preference for female employees. (Compl. ¶¶ 30, 77). But as noted above, Schaffer does not allege that these comments were directed at him or had any impact on him. Nor does he appear to rely on them in support of his hostile work environment claims. Even if he did so rely on them, however, Stueland's comments were not so severe or pervasive as to state a claim under Title VII. *See, e.g.*, *Kugel v. Queens Nassau Nursing Home Inc.*, 568 F. Supp. 3d 253, 266 (E.D.N.Y. 2021) (dismissing hostile work environment claim where plaintiff did not allege that she was "subjected to daily, constant, or continuous patterns of hostile behavior"); *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 781 (S.D.N.Y. 2019) (dismissing claim based on "isolated and sporadic incidents that occurred over the course of a year"); *Lenart v. Coach Inc.*, 131 F. Supp. 3d 61, 68–69 (S.D.N.Y. 2015) (dismissing claim that employer made comments on "numerous occasions" that she would "like to have a staff of all women" as insufficiently pervasive). Moreover, Schaffer "fail[s] to allege that these remarks unreasonably interfered with h[is] job performance."

77

*Brown v. Coach Stores, Inc.*, 163 F.3d 706, 713 (2d Cir. 1998) (citing *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21–23 (1993)).

Schaffer also alleges that Stueland unfairly had Fenwick monitor his work product and blamed him for problems that were not his fault.  (Compl. ¶¶ 53–55, 73, 109).  These allegations fare no better, however, as even intense scrutiny and hawkish micro-management is insufficiently severe or pervasive to state a claim for hostile work environment under Title VII.  *See, e.g.*, *Doran v. New York State Dep't of Health Off. of Medicaid Inspector Gen.*, No. 15 Civ. 7217 (PKC) (SN), 2017 WL 836027, at \*16 (S.D.N.Y. Mar. 2, 2017) (dismissing claim as "a supervisor's close scrutiny and unreasonable criticism, without more, fails to rise to the level of discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive" to adequately allege a hostile work environment claim); *Paupaw-Myrie*, 653 F. Supp. 3d at 105 (dismissing claims that, *inter alia*, supervisor ridiculed plaintiff, subjected her to harsher scrutiny, refused to provide support, called her at late hours, and was extremely aggressive as "not plausibly objectively severe or pervasive enough to constitute a hostile work environment").  Rather, outside counsel's monitoring of work-related tasks at Stueland's direction constitutes the ordinary kind of workplace behavior that, even if frustrating to Schaffer, does not rise to the level of a hostile work environment.

Accordingly, Schaeffer has failed to state a plausible hostile work environment claim under Title VII (or § 1981 or the CFEPA).  As such, Schaffer's hostile work environment claims should be dismissed.

## E. Intentional Infliction of Emotional Distress Claim

In order to state a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must plausibly allege: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999); *Cagle v. Weill Cornell Medicine*, 680 F. Supp. 3d 428, 438 (S.D.N.Y. 2023).

Here, Schaffer premises his IIED claim on the totality of conduct alleged, including "having his responsibilities being given to White outside counsel, being monitored by a White outside counsel, unfairly blamed for issues he had no control over, being treated disparately compared to White females in a similar position to him, and experiencing erratic and troubling behavior from the White female CEO he reported to, and being terminated." (Compl. ¶ 201). Schaffer alleges that this conduct, including his termination in August 2024, was intentional on the part of GeneDx, involved "extreme and outrageous" conduct, and caused Schaffer "distress" rising to the level required under law. (*Id.* ¶ 202–04). Defendant argues that Plaintiff's factual allegations, even if true, do not rise to the level of "extreme and outrageous" required to state a claim. (Def. Br. at 24).

"[T]he standard for stating a valid claim of intentional infliction of emotional distress is 'rigorous, and difficult to satisfy' [and] [t]he conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

civilized society.'" *Conboy v. AT & T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (quoting *Howell v. New York Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699, 702 (1993), and *Stuto*, 164 F.4th at 827). "Where, as here, the plaintiff premises an intentional infliction of emotional distress claim on harassment, discrimination, or retaliation in the employment context, New York courts are particularly reluctant to find that such conduct is sufficiently extreme or outrageous to satisfy this demanding standard 'absent a deliberate and malicious campaign against the plaintiff.'" *Robles v. Cox & Co.*, 841 F. Supp. 2d 615, 631 (E.D.N.Y. 2012) (quoting *Fertig v. HRA Med. Assistance Program*, No. 10 Civ. 8191 (RPP), 2011 WL 1795235, at *6 (S.D.N.Y. May 6, 2011), and collecting cases); *see also Semper v. N.Y. Methodist Hosp.*, 786 F. Supp. 2d 566, 587 (E.D.N.Y. 2011) ("New York Courts are reluctant to allow [IIED] claims in employment discrimination cases . . . . Acts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities fail to sustain a claim of [IIED] because the conduct alleged is not sufficiently outrageous." (internal quotation marks and citations omitted)).

"'The determination [of] whether the requisite outrageousness has been established is, in the first instance, an issue of law for the courts.'" *Rodgers-King*, 2024 WL 382092, at *9 (quoting *Cavallaro v. Pozzi*, 28 A.D.3d 1075, 814 N.Y.S.2d 462, 465 (4th Dep't 2006)). "Courts can and frequently do dismiss intentional infliction of emotional distress claims in a pre-answer motion where the conduct

80

alleged, even accepted as true, is not sufficiently outrageous as a matter of law." *Cherner*, 2025 WL 1745864, at *19.

Even accepting as true the conduct and discrimination alleged in the complaint (*see* Pl. Br. at 22–23 (summarizing allegations in support of Plaintiff's IIED claim)), the Court finds that these allegations are insufficient to meet the threshold for extreme and outrageous conduct necessary to sustain a claim for intentional infliction of emotional distress. *See, e.g.*, *Cherner*, 2025 WL 1745864, at *19 ("'As a general proposition, adverse employment actions, even those based on discrimination, are not sufficient bases for intentional infliction claims.'" (quoting *Emmons v. City Univ. of New York*, 715 F. Supp. 2d 394, 424 (E.D.N.Y. 2010))); *Rodgers-King*, 2024 WL 382092, at *9 (concluding that the plaintiff had not alleged extreme and outrageous conduct where he asserted that the defendant "deceived him about his role and discriminated against him by excluding him from key business discussions, preventing him from obtaining the necessary resources, failing to promote him, and [ultimately] terminating him"); *Benjamin v. N.Y.C. Dept. of Health*, No. 99 Civ. 12345 (LTS) (AJP), 2002 WL 485731, at *1, *8–9 (S.D.N.Y. Mar. 29, 2002) (IIED claim dismissed where plaintiff alleged a long pattern of discrimination based on national origin, including "mimicking Plaintiff's accent and cultural mannerisms in front of the staff, sabotaging Plaintiff's job efforts, and accusing Plaintiff of falsehoods"); *Lydeatte v. Bronx Overall Econ. Dev. Corp.*, No. 00 Civ. 5433 (GBD), 2001 WL 180055, at *2 (S.D.N.Y. Feb. 22, 2001) (dismissing IIED claim where plaintiff alleged "that defendant was biased against

her based on her race, that she was harassed and treated poorly on the job, and that she was denied the same benefits, opportunities and conditions of employment as her Hispanic co-workers until she was ultimately wrongfully terminated").

Accordingly, this Court recommends dismissal of Schaffer's claim for intentional infliction of emotional distress.

## CONCLUSION

For the foregoing reasons, the undersigned respectfully recommends: (1) that Defendants' motion to dismiss as to Plaintiff's claims for fraudulent misrepresentation and inducement (Count One), breach of contract (Count Two), breach of the implied covenant of good faith and fair dealing (Count Three), race and sex discrimination under the NYSHRL and the NYCHRL (Counts Six, Seven, Ten and Eleven), and intentional infliction of emotional distress (Count Thirteen) be **GRANTED**; and (2) that Defendants' motion to dismiss as to Plaintiff's claims for race and sex discrimination under Title VII, § 1981, and the CFEPA (Counts Four, Five, Eight, Nine, and Twelve) be **GRANTED** to the extent those claims allege hostile work environment and otherwise be **DENIED**.

DATED:     New York, New York
           January 30, 2026

_____
The Honorable Gary Stein
United States Magistrate Judge

82

83

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. Section 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen days, inclusive of weekends and holidays, from service of this Report and Recommendation to file written objections thereto. *See also* Fed. R. Civ. 6(a), (b), and (d). Any such objections shall be filed with the Clerk of Court. Any request for an extension of time to file objections must be directed to the Honorable Dale E. Ho. A failure to file timely objections will preclude appellate review. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).